**Madgey JACKSON, Plaintiff-Appellant,**

v.

**Richard SCHWEIKER \*, Secretary of Health and Human Services, Defendant-Appellee.**

**No. 81–1391.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 30, 1981.

Decided July 20, 1982.\*\*

As Modified on Denial of Rehearing Oct. 28, 1982.

---

\* Richard Schweiker, successor in office to Patricia Roberts Harris as Secretary of Health and Human Services, is substituted as a defendant pursuant to Fed.R.App.P. 43(c)(1).

\*\* Pursuant to Circuit Rule 16, this opinion has been circulated among all the judges of this court in regular active service inasmuch as it arguably conflicts with related decisions of the First, Ninth and Tenth Circuits. No judge requested a hearing *en banc.*

Ivan E. Bodensteiner, Leg. Service Program of N. Ind., Valparaiso, Ind., for plaintiff-appellant.

Larry K. Banks, Dept. of Health & Human Service, Baltimore, Md., for defendant-appellee.

Before CUDAHY, Circuit Judge, FAIRCHILD, Senior Circuit Judge, and BROWN,*** Senior District Judge.

CUDAHY, Circuit Judge.

In this class action, plaintiff Madgey Jackson ("Jackson") appeals from a judgment in favor of the defendant Secretary of Health and Human Services (the "Secretary") arising from Jackson's challenge to the Secretary's termination of her Supplemental Security Income ("SSI") benefits. The specific issue presented by this appeal concerns the validity of the Secretary's regulations governing SSI eligibility which impute as unearned income to SSI recipients the difference between the fair market rental value and the rent actually paid for shelter. We vacate the summary judgment and remand to the district court for further proceedings because we find that the Secretary's formula for imputation of income to class members in certain specifically limited situations is not consistent with certain other of the Secretary's regulations properly construing the controlling statute.

## I.

On July 27, 1978, the Social Security Administration ("SSA"), acting on behalf of the Secretary, determined that Jackson was eligible due to her disability to receive SSI benefits. SSI is a program for the aged, blind and disabled designed to insure that the income of eligible recipients does not fall below a minimum amount or "floor". In 1978, this floor amount for a person in Jackson's position was set at $189.40 per month. Jackson received a monthly Veterans Administration ("VA") pension of $133.00 and a monthly benefit of $100.08 under a state housing allowance program. The latter benefit was excluded by statute from the income counted for determining SSI eligibility. Thus, Jackson's SSI benefit amounted to the difference between $189.40 and $133.00, or $56.40.

Sometime in September, 1978, Jackson moved into a house owned by her sister. She lived alone and paid her sister a monthly rent of $145.00. After Jackson moved in, her sister contacted the local SSA office to request an increase in Jackson's benefit. During this conversation, Jackson's sister informed the SSA that she would charge a tenant who was not a relative rent of $250.00 per month for the house. Shortly thereafter, SSA terminated Jackson's SSI benefit because Jackson's income for SSI purposes (including "in-kind" income representing the difference between the rent actually paid by Jackson and the fair market rental value of her sister's home, which was added to Jackson's $133.00 VA pension) now exceeded the $189.40 cut-off amount, below which SSI was payable.[1] Jackson's request for reconsideration was denied. She subsequently appealed this determination to an Administrative Law Judge (ALJ), but the ALJ upheld the SSA action. Jackson's request for review by the Appeals Council was also denied on June 22, 1979.

On July 25, 1979, Jackson filed the class action that is the subject of this appeal. She claimed that the Secretary's practice of considering as income to the recipient the difference between fair market rental value and the actual rent paid by an SSI recipient was inconsistent with the statute, created an irrebuttable presumption violating the due process clause of the fifth amendment, invidiously discriminated between similarly

***

*** The Honorable Wesley E. Brown, Senior District Judge for the District of Kansas, is sitting by designation.

1. The specific details of this computation, together with the relevant statutory and regulatory bases, are examined in detail in section II *infra.*

situated recipients in violation of the equal protection clause of the fifth amendment, and lacked both a substantial and rational relation to the statutory goal in violation of due process. On November 19, 1979, the district court denied Jackson's motion for class certification for failure to demonstrate that class members had exhausted their administrative remedies under 42 U.S.C. § 405(g) (1976). *Jackson v. Harris*, 84 F.R.D. 602 (N.D.Ind.1979). The district court subsequently modified its November 19 order *sua sponte* to hold that Jackson's motion for class certification was denied for failure to satisfy the numerosity requirement of Fed.R.Civ.P. 23(a)(1), but that exhaustion of administrative remedies for each class member was not necessarily required. 84 F.R.D. at 606; *see Wright v. Califano*, 603 F.2d 666, 669–70 (7th Cir. 1979), *cert. denied*, 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980).

Upon Jackson's motion for reconsideration, the district court entered an order on April 10, 1980, certifying Jackson as class representative under Fed.R.Civ.P. 23(a) and 23(b)(2) to represent the class

> of all recipients of and applicants for [SSI] in the State of Indiana who have had, or will have, SSI benefits reduced, terminated or denied because of the application of 20 C.F.R. § 416.1125 [1980] insofar as it requires that the difference between the fair market value and the actual price paid by an SSI recipient or applicant for a necessity of life be considered as countable, in-kind income.

*Jackson v. Harris*, 86 F.R.D. 452, 454 (N.D. Ind.1980).

Both parties thereafter moved for summary judgment. On January 15, 1981, the district court issued its memorandum opinion and order rejecting Jackson's claims that the Secretary's regulations violated the statute and the Constitution and granting the Secretary's motion for summary judgment. While the motions for summary judgment were pending before the district court, the court, at the Secretary's request, remanded to the Secretary for further proceedings the specific case involving Jackson.

The reason for this remand is unclear from the record, although it was mentioned at oral argument that a question may have arisen as to the true fair market value of the home rented by Jackson; the record further indicates that Jackson moved from her sister's home and thus may have again become eligible for SSI.

■ We have not been informed whether the Secretary has reinstated Jackson's benefits or recomputed her benefits based on a lower market rental value for her sister's house. Thus, we are unable to determine whether her individual case is currently moot. Notwithstanding this potential mootness, we believe that the claims of the certified class members present a sufficient case or controversy and that the named plaintiff on this appeal has adequately represented the interests of the class pursuant to Fed.R.Civ.P. 23. *See Franks v. Bowman Transportation, Inc.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). However, we leave for further consideration by the district court whether Jackson should continue to represent the certified class in the proceedings on remand that are contemplated by our opinion on the merits. *See* section IV *infra*; 3B *J. Moore, Moore's Fed.Prac.* ¶ 23.04[2], at 135–37 (1982). In any event, at this juncture we have before us the claims of the certified class of all those SSI recipients described above.

The parties on appeal, however, have continued to use the specific facts of Jackson's case to demonstrate how the Secretary's regulations are typically applied. Moreover, Jackson relies on the specific facts of her case to argue that the application of the Secretary's regulations to members of the certified class violate both the statute and the Constitution. Although we may be unable to grant any specific relief to Jackson, we believe that the facts of her case present particular circumstances in which the Secretary's application of this regulation imputing unearned income to SSI recipients as defined in the class certification order does not comport with other valid SSI regulations designed to insure that only income "actually available" to meet "basic needs" is

attributed to a recipient. Hence, we shall set out in detail the specific facts of Jackson's case as they illustrate the operation of the regulations. This analysis will govern whatever relief the district court may make available to class members on remand.[2]

## II.

"Income" for determining SSI eligibility includes unearned income, which is defined as "support and maintenance furnished in-kind." 42 U.S.C. § 1382a(a)(2) (1976). To implement the statute, the Secretary has defined "in-kind" income as "the receipt by an individual of any property or service which he can apply, either directly or by sale or conversion to meet his *basic needs* for food, clothing and shelter." 20 C.F.R. § 416.1102(a) (1980) (emphasis supplied).[3] The Secretary's regulations further provide that "in determining the amount of un-earned income the amount *actually available* to the individual is considered." 20 C.F.R. § 416.1120 (1980) (emphasis supplied).

In Jackson's case, the Secretary determined that the measure of Jackson's "un-earned income" is the lesser of (1) current market rental value less rent actually paid ($250 minus $145 = $105) or (2) one-third of the SSI payment standard plus the exclusion for unearned income (⅓ ($189.40), or $63.13, plus $20 = $83.13), the "presumed maximum benefit value". *See* note 6 *infra*. This calculation is prescribed in 20 C.F.R. §§ 416.1125(a) and (d) (1980), which provides:

§ 416.1125 *Unearned income; support and maintenance*

(a) *General.* Unearned income includes support and maintenance furnished in cash or in-kind unless otherwise excluded under this subpart K. Support and main-tenance in-kind encompasses food, cloth-ing and shelter or any portion of any or all of such items....

.    .    .    .    .    .

(d) *Valuation of support and mainte-nance for individuals in household situa-tions....* When an eligible individual ... lives in a household (i.e. is not in an institution) ... any support and mainte-nance received in-kind but not received in lieu of cash wages ... is unearned in-come. In such cases ... the maximum value of such support and maintenance is presumed to be that amount which, for an individual or a couple with no other

2. The Secretary has litigated this case on a generalized "all or nothing" basis, *i.e.*, the Sec-retary's regulation (20 C.F.R. § 416.1125(d) (1981)) must be either valid or invalid as ap-plied in all situations. This is not surprising in that the three appellate courts that have con-sidered the validity of the regulation also ad-dressed the issue on that basis. *See Busch-mann v. Schweiker*, 676 F.2d 352 (9th Cir. 1982); *Usher v. Schweiker*, 666 F.2d 652 (1st Cir. 1981); *Kimmes v. Harris*, 647 F.2d 1028 (10th Cir.), *cert. denied*, 454 U.S. 898, 102 S.Ct. 400, 70 L.Ed.2d 214 (1981); *Antonioli v. Harris*, 624 F.2d 78 (9th Cir. 1980). We reject such an "all or nothing" approach as inappro-priate in the instant case. This case, unlike the other above-named challenges to the Secre-tary's regulation, is a class action. Although her individual case may be moot, Jackson con-tinues to represent the certified class without apparent objection. Because the eventual dis-position of this case depends in large part upon the particular facts pertaining to each individu-al claimant-class member—facts which we do not have before us—we use the facts of Jack-son's own case as they clearly demonstrate an instance where the challenged regulation is not applied consistently with several other of the Secretary's regulations. Implicit in our analy-sis, then, is our acceptance of the general valid-ity of the regulation as applied in many situa-tions from which the decisions of various other courts arise, including the decisions of other Courts of Appeals. These courts, however, did not consider a factual situation comparable to that presented here. Hence, we believe that a limited reappraisal of the Secretary's regula-tions has not been effectively foreclosed by the weight of judicial authority.

3. Throughout this opinion, we usually refer to the versions of the Secretary's regulations in effect at the time Jackson's benefit was termi-nated because the class was certified in explicit reliance on these versions and the parties con-tinued to present the case based on these regu-lations even though they were rewritten and renumbered in 1980 before argument in this appeal. *See* 45 Fed.Reg. 65547 (1980) (codified in 20 C.F.R. §§ 416.1100–.1266 (1981). The Secretary has assured us that the provisions of the current regulations and the regulations ap-plied to Jackson are the same. *See* Brief for Appellee at 3 n.2.

income, would result in payment at two-thirds of the applicable payment standard, *i.e.*, the value is presumed to be one-third of the payment standard, plus the exclusion applicable to unearned income. This presumption will be applied in determining the benefits payable unless it is rebutted by the individual's establishing the current market value of such support and maintenance, less any payment he makes therefor, is lower than the presumed value.[4]

Before the SSA's action in her case, Madgey Jackson received $56.40 as an SSI benefit in addition to her $133.00 VA pension. The SSI therefore brought her total countable income up to the then standard subsistence level of $189.40. Jackson paid $145.00 as rent for the house belonging to her sister. Out of the cash income of $189.40, Jackson thus paid $145.00, or approximately 77%, for shelter.[5] Under these circumstances, the *cash* actually available to meet Jackson's costs other than shelter costs was $189.40 less $145.00 or $44.40. Similarly, the percentage of Jackson's cash income then available to meet costs *other* than shelter costs was $44.40 out of a total of $189.40, or approximately 23%.

The Secretary terminated Jackson's SSI benefit on the theory that her total income, including certain "unearned income" imputed to her, exceeded the SSI eligibility level. The Secretary has imputed this "unearned income" based on a calculation of the excess of "current market value" of her sister's house over the rent actually paid. This excess amounts to $105.00 per month, but, pursuant to the regulations, the applicable amount for purposes of imputation of "unearned income" is $83.13. *See* 20 C.F.R. § 416.1125(d) (1980). Essentially, the Secretary contends that $105.00 represents the *additional* (or incremental) value of the rented house over and above the $145 in cash rent. However, instead of $105.00, the lesser sum of $83.13 is applied under the regulations, apparently because it represents a sort of shelter "budget" unrelated to fair rental value. *See Usher v. Schweiker*, 666 F.2d 652, 658 n.14 (1st Cir. 1981).[6]

After termination of her SSI benefit, Jackson's total income, including the imputed "unearned income," is by the Secretary's analysis $133.00 (VA pension) plus $83.13 ("unearned income") for a total of $216.13. Assuming arguendo that the $83.13 may be imputed to Jackson as income, it is also necessary to show that income on an appro-

4. This provision is specifically applicable to a person who lives in his own household (including a commercial establishment) or the household of another and receives in-kind support (but not both food and shelter). *See* 20 C.F.R. § 416.1125(d) (1980). *See also* 20 C.F.R. §§ 416.1130(c), 416.1131(b), 416.1132, and 416.1141–.1143 (1981). For a discussion of the presumed maximum benefit value rule, as applied to individuals who live in the household of another and receive both food and shelter, *see* Note, 65 *Cornell L.Rev.* 909 (1980).

5. The average cost of modest, safe, decent and sanitary housing in the South Bend, Indiana, area where Jackson resides is approximately $130.00 per month according to a study completed by the Rand Corporation. *See* Affidavit of Roger Chrastil, Ex. B (filed with ALJ), Feb. 7, 1979.

6. The regulation provides that the presumed in-kind income will be counted up to a maximum of $83.13 in this case. The latter figure is derived by taking one-third of the maximum potential SSI benefit of $189.40 and adding to this quotient the sum of $20.00 which represents the general exclusion from income appli-

cable to unearned income. *See* 20 C.F.R. § 416.1125(d) (1980). The sum total of this calculation is the "presumed maximum benefit value." The regulation does not explain, nor has the Secretary articulated any reason, why the maximum imputed in-kind income is cut off at $83.13, although the Secretary's new regulations state that this rule is used "because, [if the recipient has] no other income, it will give [the recipient] the same Federal benefit [he or she] would receive under the one-third reduction rule." 20 C.F.R. § 416.1140(a) (1981). The one-third reduction rule is used when the recipient lives in another's household and receives *both* food *and* shelter. 20 C.F.R. § 416.1130(c) (1981). Rather than determine the actual value of the in-kind support and maintenance provided in these cases, the SSA will automatically reduce the recipient's *benefit* standard by one-third. The presumption apparently is that the amount represented by one-third of the maximum payable SSI benefit represents a normal budget for food *and* shelter. The Secretary apparently applies a like presumption where the recipient lives on his or her own and does *not* receive both food and shelter in kind.

priate income statement as an *expenditure* for shelter. This is so because the $83.13 is neither "saved" nor available to pay any non-shelter expenses; if it is "income," it can only be deemed to be expended for the very additional shelter which it allegedly represents. Thus, after termination of SSI, Jackson's total expenditures for shelter would be $145.00 (cash rent) plus $83.13 (unearned income) for a total of $228.13.

These calculations indicate at least in theory, if not in fact, that after termination of SSI, Jackson would be devoting $228.13 of her "income" to shelter costs out of a total available income of $216.13, or approximately 106%. The $12.00 deficit incurred after payment of shelter costs alone would correspond exactly to the cash deficit which *in fact* may result from trying to cover a $145.00 rental payment with the $133.00 VA pension left after Jackson's SSI is terminated, even without attempting to impute any other income or expenses. This is, of course, a deficit incurred in meeting *shelter costs alone*, with nothing left to provide the other necessities of life.[7]

Merely to recite these calculations and to note in various circumstances the percentages of income (sometimes greater than 100%) actually or hypothetically committed to the costs of shelter reveals the apparent economic unreality of the Secretary's regulations as applied to the particular facts of the Jackson case. This economic unreality strongly suggests a serious infirmity in the Secretary's efforts to apply the statute and the regulations in situations similar to the one represented by Jackson.[8]

III.

■ We believe the question whether unearned income measured by an excess of market value over actual cost for shelter is "actually available" *to a recipient* to meet *basic subsistence needs* is the only fairly arguable issue in this case.[9] 20 C.F.R.

---

7. An "interim" (and perhaps purely hypothetical) situation is represented by the state of affairs existing after imputation of "unearned income" to Jackson but before termination of Jackson's SSI benefit. Let us assume that the SSI benefit of $56.40 continues to be paid and is not promptly terminated. Under these circumstances, the Secretary's analysis requires the imputation of "unearned income" of $83.13, *i.e.*, the presumed maximum benefit, instead of the difference between current market value and actual rent paid. On the other hand, for the reasons explained in the text, that same $83.13 must be imputed as an expenditure for shelter, unavailable to meet any non-shelter costs. Under this analysis, Jackson's total "income" would be $133.00 (VA pension) plus $56.40 (SSI) plus $83.13 (imputed unearned income) for a total of $272.53. Of this amount, $145.00 plus $83.13, or $228.13, would be committed to covering shelter costs. Thus, $228.13 out of $272.53, or approximately 84%, would represent her percentage of "income" spent for shelter, leaving only about 16% of income available to cover non-shelter costs.

8. There is nothing in the record to support the proposition that Jackson chose deliberately to commit a high percentage of her income to shelter and, therefore, should bear the harsh consequences dictated by the Secretary's regulations. Renting her sister's house does not represent for Jackson a "market" choice. Presumably, Jackson's choice of housing may have been influenced by a desire to associate herself with her sister and her inability due to disabili-

ty to actively seek other housing. In connection with a program for very low income aged, blind and disabled persons, we cannot regard such an arrangement as inappropriate or the proper subject of an economic penalty. *Cf.* 20 C.F.R. § 416.110(c) (1980) (SSI designed to protect "people's dignity" and thus "[n]o restrictions ... are placed on how recipients spend the Federal payments"). The reasonableness of this rental arrangement is also demonstrated by the fact that Jackson, before moving into her sister's house, paid $145.00 a month for rent and utilities to an unrelated landlord to live in another residence. Moreover, the Rand Corp. survey indicated that the average cost of modest shelter in this area was $130.00 per month. *See* note 2 *supra.*

9. Jackson's constitutional arguments (due process and equal protection) have been uniformly rejected by the appellate courts that have considered these constitutional issues. *See Usher v. Schweiker*, 666 F.2d 652, 658–62 (1st Cir. 1981); *Kimmes v. Harris*, 647 F.2d 1028, 1033 (10th Cir.), *cert. denied*, 454 U.S. 898, 102 S.Ct. 400, 70 L.Ed.2d 214 (1981); *Nunemaker v. Sec. HEW U.S.A.*, 679 F.2d 328 (3d Cir. 1982); *accord Glasgold v. Secretary of HSS*, No. 77 C 1363 (E.D.N.Y. Jan. 7, 1982); *Chapman v. Secretary of HSS*, No. CV 79–4651–RJK(T) (C.D.Cal. Apr. 22, 1981). We join the First and Tenth Circuits in rejecting the claims of constitutional infirmity in the Secretary's regulations effectuating the statutory command.

§ 416.1120 (1980) (emphasis supplied); *see* 20 C.F.R. § 416.1102(a) (1980). The Secretary proposes and accepts a "purchasing power" test for resolving this issue by asserting that the effect of the alleged subsidized rent in this case is "to give [Jackson] $105.00 more purchasing power than an otherwise similarly situated SSI recipient who has to purchase shelter on the open market." Appellee's Brief at 18. We agree that the Secretary is on solid ground in attempting to apply a "purchasing power" test because increasing purchasing power to bring it up to the minimum poverty level is the underlying purpose of the SSI statute and the accompanying regulations. It is simply incorrect, however, to say that "purchasing power" has been increased by $105.00 for an SSI recipient like Jackson who was already spending 77% of her income for shelter before the Secretary imputed to her any unearned income applicable to shelter.

■ An increase in "purchasing power" can only mean an increased ability to pay for goods that are needed or wanted. In a case like Jackson's, the imputed additional value of housing merely represents some excess value of shelter beyond 77% of Jackson's income and thus presumably beyond anything required to meet her basic needs. The increased value to Jackson, or a similarly situated recipient, of the additional shelter is, *as shelter*, minimal; moreover, no additional funds have been made available to Jackson to meet non-shelter needs. The additional shelter is, in effect, "phantom income." In the argot of economics, the marginal utility (or incremental value) of the additional housing, to a recipient already devoting 77% of her income to shelter, although greater than zero, is far less than the excess of market value over actual rent. *See generally* 1 K. Boulding, *Economic Analysis—Microeconomics* ch. 24 (4th ed. 1968); P. Samuelson, *Economics*, 425–26, 433–38 (10th ed. 1976). Any increase in purchasing power is, therefore, much less than that suggested by the Secretary's regulation.[10]

■ The leading cases in the area, even in upholding the regulations in other fact situations, are not inconsistent with this analysis. For example, in *Antonioli v. Harris*, 624 F.2d 78 (9th Cir. 1980), the SSI recipient paid shelter expenses of only $24.80 per month for property taxes and maintenance expenses on a house he rented from his father. The Secretary determined that unearned income of the difference between $24.80 and $75.00, which was the current market rental value of the house, should be imputed to the recipient. The Ninth Circuit had no difficulty in perceiving that the recipient's payment of the relatively cheap below market rent meant that he "fared better and had more resources available [for other needs] than other recipients." 624 F.2d at 80. The recipient received the then maximum SSI benefit amount of $167.80 per month from which he paid $24.80 toward shelter costs thus expending *14%* of his income for shelter. After "unearned income" was imputed, the recipient was spending $75.00 out of a cash and in-kind income of $228.00, or about 33% for shelter costs—not an abnormally large percentage. On these facts, it is quite possible to say that the additional shelter value became "actually available" to meet "basic needs" and that purchasing power was in-

---

**10.** Of course, we recognize that the Secretary's regulation allows a recipient to rebut the imputation of the presumed maximum benefit by demonstrating "that the current market value of such support and maintenance, less any payment he makes therefor, is lower than the presumed value." 20 C.F.R. § 416.1125(d) (1980). There is no indication in this record, however, that the Secretary presently considers as relevant the financial position of the *individual recipient* and, in particular, whether any imputed income is *actually available* to the recipient when computing the "current market value of such support and maintenance." Thus, the Secretary's adherence to the procedure set out in section 416.1125(d) in cases similar to Jackson's contravenes the Secretary's requirement for insuring that income is "actually available," 20 C.F.R. § 416.1120 (1980), to meet basic needs, *see* 20 C.F.R. § 416.1102(a) (1980).

In the instant case, the "cut-off" of in-kind income at $83.13 has no effect since, whether valued at $105 or $83.13, the imputed income results in Jackson's loss of SSI benefits. *See generally* Note, 65 *Cornell L.Rev.* 909, 929–30 (1980).

creased to the full extent of the subsidy [11] for the recipient in *Antonioli.*

In *Kimmes v. Harris,* 647 F.2d 1028 (10th Cir.), *cert. denied,* 454 U.S. 898, 102 S.Ct. 400, 70 L.Ed.2d 214 (1981), the recipient received $187.80 per month, from which she paid about $70.00 per month for lot rental, taxes, licenses and maintenance expenses incurred in the upkeep of a house trailer owned by her sister allegedly worth $150.00 per month. The Secretary imputed to her $75.93 as income under the presumed benefit rule of 20 C.F.R. § 416.1125(d) (rather than the $80.00 differential between current market rental and the amount actually paid by the recipient). The Tenth Circuit made no real effort to give meaning to the "actually available" requirement. The court merely noted

> that the difference between what Mrs. Kimmes paid as expenses in connection with her otherwise rent-free use of the trailer and the current rental value of the trailer does represent in-kind income which is actually available to her.... The fact that such benefit is not cold hard cash is of no moment. We are dealing here with unearned income *in kind.*

647 F.2d at 1033–34 (emphasis in original). Notwithstanding this dearth of analysis, we

believe that the end result reached by the *Kimmes* court was defensible in terms of the actual availability of income to meet basic needs. Before the Secretary's action in *Kimmes,* the recipient spent about 37% of her income for shelter; after imputing the unearned income to her, the recipient would be spending about 66% of her income for shelter—leaving her with almost $70.00 per month to pay for other necessities. This result is not, to us, necessarily unreasonable or in conflict with the Secretary's regulations. [12]

But we cannot accept the apparent thesis of *Kimmes* that the sole purpose of the "actually available" requirement is to insure that "in-kind" as well as "cash" income is counted in determining SSI eligibility. Other provisions in the statute and regulations clearly specify that both property in kind and cash constitute income for SSI purposes. *See* 42 U.S.C. § 1382a(a)(2)(A) (1976); 20 C.F.R. §§ 416.1102(a), 416.-1125(a) (1981). *See also, Califano v. Heinol,* 576 F.2d 112, 115 (7th Cir. 1978) (per curiam). To construe the phrase "actually available" as merely allowing the imputation of in-kind income renders the phrase superfluous. [13] Instead, we think the "actually available" requirement is a way of in-

---

**11.** We do not intend to imply that the Ninth Circuit in its *Antonioli* opinion adopted our reasoning. In fact, the court in that case did not specifically address the "actually available" issue. We believe, however, that an analysis of the facts in *Antonioli* discloses a situation where the Secretary's regulations could be applied without violation of the "actually available" principle and in a way which reflected a real increase in purchasing power. But *see Young v. Schweiker,* 680 F.2d 680 (9th Cir. 1982) (Farris, J., concurring).

**12.** Apparently, five plaintiffs were involved in *Usher v. Schweiker,* 666 F.2d 652, 655 n.8 (1st Cir. 1981). That court's opinion, however, did not specify the incomes (before or after termination of SSI) of the plaintiff recipients and thus, we are unable to analyze whether imputed unearned income was actually available to meet basic needs. We note too that the *Usher* court held, without making any detailed assessment of the individual facts before it, that imputed income from shelter represented "real and tangible benefits" and thus, was actually available to the plaintiffs. 666 F.2d at 657.

The Ninth Circuit's most recent decision in *Buschmann v. Schweiker,* 676 F.2d 352 (9th Cir. 1982), also fails to completely specify the

facts concerning the income of the named plaintiff before and after imputation of unearned income and thus, we cannot make an assessment here as we have done in the cases discussed in the text. *See also Herndon v. Schweiker,* 680 F.2d 678 (9th Cir. 1982). *Also, Buschmann* citation is: 676 F.2d 352 (9th Cir. 1982).

**13.** The Secretary argues that his regulation providing for the imputation of in-kind income (20 C.F.R. § 416.1125(d) (1980)) impliedly incorporates the actual availability requirement. According to the Secretary, this interpretation should be accorded deference and granted significance because the Secretary voluntarily subjected himself to the actual availability requirement. Appellee's Brief at 8–9. The Secretary's argument in this case is not persuasive because the Secretary has provided us with no basis to conclude that section 416.1125(d), as applied to the instant facts, in fact honors the actual availability requirement. Although deference is properly accorded to the Secretary's interpretations of his own regulations, such deference must be tempered when the Secretary's interpretation, under particular facts, apparently ignores purchasing power and actual availability.

suring that imputed income represents real growth in purchasing power to meet basic needs.[14] And purchasing power grows if in-kind contributions of shelter either make cash available to purchase necessities of life other than shelter or if, *and to the extent,* the quality of shelter itself is enhanced *to meet basic needs.*[15]

---

**14.** We generally agree with the court in *Usher,* 666 F.2d at 656–57, that cases construing the "currently available" requirement in the welfare context, *see* 45 C.F.R. § 233.20(a)(iii)(C) (1981), are of limited value in interpreting the "actually available" clause at issue here because the question in most welfare cases is *whose* income is available to a welfare recipient. *See, e.g., Van Lare v. Hurley,* 421 U.S. 338, 345–48, 95 S.Ct. 1741, 1746–48, 44 L.Ed.2d 208 (1975). Moreover, we accord little weight to cases construing the SSI "actually available" requirement in terms of whose income is available. *See, e.g., Tsosie v. Califano,* 651 F.2d 719, 723 (10th Cir. 1981). However, several more closely analogous welfare decisions involving the determination of the extent to which mortgaged assets are available resources to welfare recipients are helpful for our analysis. For example, in *National Welfare Rights Org. v. Mathews,* 533 F.2d 637, 647–48 (D.C. Cir.1976), the court held that the Secretary ignored economic reality by valuing mortgaged assets at their gross market value rather than considering the recipient's equity in such assets as a measure of currently available resources. *Accord, Green v. Barnes,* 485 F.2d 242, 244 (10th Cir. 1973); *Reid v. Toia,* 424 N.Y.S.2d 964, 72 A.D.2d 465 (4th Dept. 1980).

**15.** The Secretary contends that his regulations are consistent with the legislative history of 42 U.S.C. § 1382a(a)(2)(A) (1976). We have no doubt that Congress has directed the Secretary to consider in-kind income when determining SSI eligibility. Nothing in the legislative history cited by the Secretary, however, supports his interpretation of the "actually available" requirement, especially when it is applied to a recipient who lives in her own household and pays over 75% of her income for rent. *See* Appellee's Brief at 12–18. The proposed 1977 amendments were designed to allow the Secretary to value support and maintenance received in kind at their *actual value* rather than to cut off this value calculation at the level of the presumed maximum benefit value—a rule which, if it had been enacted, would have been detrimental to SSI recipients like Jackson. *See The Supplemental Security Income Program,* 95th Cong., 1st Sess. 72–75 (S. Finance Comm. Print 1977); S.Rep.No.573, 95th Cong., 1st Sess. 44–45 (1977). These amendments, however, were never enacted into law. The legislative history thus provides no support for the Secretary's regulation beyond the arguable interpretation that Congress' failure to enact the amendments might suggest its silent acquiescence in the use of the presumed maximum benefit value rule. Moreover, this history clearly indicates no approval or disapproval of the Secretary's interpretation of the "actually available" requirement. Thus, we view the Secretary's argument that Congress has approved his interpretation of "actually available" as unsupportable.

Moreover, the legislative history, in our view, provides only questionable support for the Secretary's application of the reduction rule to individuals who live in their own households as well as to individuals who live in the household of another. The language of the statute, 42 U.S.C. § 1382a(a)(2)(A) (1976), indicates that Congress meant to treat the two situations differently. Moreover the legislative history, *see* H.R.Rep.No.231, 92d Cong., 2d Sess. 3, *reprinted in* 1972 U.S.Code Cong. & Ad.News 5138 is ambiguous as to whether Congress intended directly to reduce the *benefit* by one-third (and thus not totally eliminate the benefit) or to impute an amount equal to the maximum presumed value to the income of recipients who live in the household of another. *Cf. Usher v. Schweiker,* 666 F.2d 652, 654 n.6 (1st Cir. 1981). The Secretary applies the statutory one-third reduction rule only when a recipient lives in another's household and receives *both* food *and* shelter. *See* C.F.R. § 416.1130(c) (1981). This result is apparently expressly dictated by the statute. But a recipient like Jackson who either lives in her own household or lives in another's household but pays for food or shelter is also subjected to the presumed maximum value rule notwithstanding the lack of specific statutory basis for the extension of the rule to these cases. *See* Note, 65 Cornell L.Rev. 909, 918, 929–30 (1980). Although the Secretary notes in the new regulations that application of the presumed maximum value rule results in the same benefit reduction as the one-third benefit value, this result, as the Secretary points out, holds true *only* when a recipient receives no income other than the SSI benefit. *See* 20 C.F.R. § 416.1140(a)(1) (1981). For example, if a recipient lives in his son's home, receives food, and also has an outside source of income which will be subtracted (less a $20.00 per month income exclusion) from his SSI benefit, his benefit will be reduced only by one-third of the amount of the maximum potential SSI benefit for that individual, by application of the one-third reduction rule. On the other hand, an individual who either lives outside his son's home and receives in-kind income or lives with his son but pays for either food or shelter will have his benefit reduced by one-third of the maximum standard PLUS the $20.00 income exclusion, as well as by the amount of the outside income. The second individual will

Where a very large percentage of income, such as 77% in Jackson's case, is committed to shelter costs *before* termination of SSI, it flies in the face of reality to conclude that "unearned income" in the form of subsidized shelter as measured by the difference between actual rent and market rent is "actually available" to the recipient. Likewise, it is incorrect to assume in this circumstance that purchasing power is enhanced to the extent of this difference in rents. The Secretary's regulation contains no mechanism to reflect amounts or proportions of income committed to shelter. Yet the percentage and amount of a recipient's income already devoted to shelter determines to a major extent the satisfaction derived from additional shelter—technically, the marginal utility of additional shelter. The degree of satisfaction derived from various imputed amounts of additional in-kind income in the form of shelter depends in large measure upon the pre-imputation income level and the pre-imputation shelter expense. In Jackson's case, for example, the additional shelter did not meet a "basic need". Further, the imputed shelter income generated only a low level of satisfaction since it was imputed only after 77% of Jackson's small income was already being spent for shelter.[16]

The thesis implicit in the Secretary's regulation that market value is the appropriate measure of value to *each recipient* presumes that the characteristics of preference-ordering or satisfaction are uniform. But consider the case of two consumers—one starving to death and 100 pounds underweight, and the other weighing precisely the amount prescribed by his doctor. Both are confronted with a pound of lard having a "current market value" of 50 cents and a pound of exquisite French pastry having a "current market value" of 50 dollars. Both items contain 4000 calories. To the person starving to death, whose basic need is immediate nutrition, the French pastry is essentially worth no more than the lard. To the person of normal appetite and caloric requirement, on the other hand, the French pastry may indeed be worth 100 times more than the lard, as its current market price suggests. Or, to restate the analogy simply and starkly: How much is a glass of water worth to a drowning man? or $105.00 of housing to a person "drowning" in housing?

Our analysis is consistent with the Supreme Court's recent decision in *Schweiker v. Gray Panthers*, 453 U.S. 34, 101 S.Ct. 2633, 69 L.Ed.2d 460 (1981). In *Gray Panthers*, the Court upheld the Secretary's regulation which allowed some states to "deem" the income of one spouse to be available to his spouse-applicant living in the same household, in determining the eligibility of the applicant spouse for Medicaid. This attribution of income could be

---

thus always receive at least $20.00 per month less, both from SSI and in total resources. Nothing appears to support this disparate treatment, based upon receipt of outside income, of recipients living in the household of another and those living in their own households.

16. The difference between market value and actual rental value might be a fair measure of value "actually available" to the recipient *over a reasonable range of incomes and of percentages of income committed to shelter.* Thus, to a recipient whose income (hypothetically) was $650 per month, an actual rental of $145 would represent about 22% of available income. If an additional $105 of shelter value were imputed *to this recipient,* his commitment to shelter would still be only about 38% of his total income—a relatively high figure but not an unmanageably large percentage. It could be realistically concluded then that his purchasing power had been enhanced to the extent of $105.00.

In Jackson's case, as we have shown, the effect of applying the Secretary's regulations is to increase the percentage of income committed to shelter from 77% to a figure exceeding 100%. In this range of percentages of income spent for shelter, the additional benefit or value *actually available* to the recipient of the shelter provided is not rationally measured by the difference between actual rent paid and current market rental. The reason for this is that the additional shelter provided no longer responds to the "basic needs", *see* 20 C.F.R. § 416.-1102(a) (1980), of a recipient who has already committed 77% of her income to shelter and it no longer enhances purchasing power to the full extent of the difference. The additional housing is thus beyond the range of basic needs. And the imputation of an additional percentage of income to shelter over and above 77% may have the effect of making fewer dollars available for the other necessities of life. These residual dollars would seem clearly essential to meet basic needs for food, clothing, etc. The loss of dollars to meet even the most essential of these basic needs represents a loss of value which probably more than offsets any additional value of shelter.

made regardless whether the non-applicant spouse actually gave some of his income in cash to the applicant spouse. *See* 42 C.F.R. § 435.723(b) (1980). The Gray Panthers argued that the regulation was inconsistent with the statutory command that only income "available" to an applicant could be considered when determining Medicaid eligibility because the Secretary often "deemed" a spouse's income to be available to an applicant even if the applicant's spouse never actually transferred money to the applicant. *See* 42 U.S.C. § 1396a(a)(17)(B) (1976). The Court rejected the Gray Panthers' proposed interpretation of the statute, noting that "available resources" are not limited solely to *"in hand"* resources. 453 U.S. at 48, 101 S.Ct. at 2642 (emphasis in original). Justice Powell, writing for the majority, went on to conclude, however, that "[w]e think that the requirement of availability refers to resources left to a *couple* after the spouse has deducted *a sum on which to live.*" 453 U.S. at 48, 101 S.Ct. at 2642 (partial emphasis supplied).

We agree with the principle implicit in Justice Powell's comment that a consideration of *availability* must be read in the economically realistic context of purchasing power to provide for one's basic needs or, consistent with Justice Powell's formulation, an amount associated with "a sum on which to live." Resources, whether they consist of the income of another spouse or the imputed difference between rent actually paid and market rental, are not actually available if they fail to enhance purchasing power—the capability for providing for basic needs. This interpretation is buttressed in the SSI context by the Secretary's own definition of income as the receipt of property or services to meet basic needs. 20 C.F.R. § 416.1102(a) (1980).

## IV.

Throughout this analysis, we have been mindful that the primary responsibility for interpreting the statute and the regulations rests with the Secretary and not with the courts. *Gray Panthers*, 453 U.S. at 44, 101

S.Ct. at 2640. This does not mean, however, that we must accept any interpretation in any situation. In the present case, plaintiff has presented the facts of her own situation where the Secretary's interpretation of his regulation governing the imputation of unearned income ignores and contradicts the Secretary's basic regulations requiring, as a condition of imputation, the actual availability of income to meet basic needs.

We are unable to determine how many other class members whose SSI benefits are reduced or terminated after unearned income was imputed to them may also be able to demonstrate that part or all of this unearned income is not actually available to meet basic needs. Because Jackson's individual case was remanded to the Secretary, it is also unclear from the record whether Jackson is now entitled to any relief consistent with this opinion. Therefore, we vacate the judgment and remand this case to the district court. As a preliminary matter, the district court should determine whether Jackson's individual suit is now moot because of action taken by the Secretary on the remand of her suit; if it is moot, the court may then consider whether the named plaintiff continues to satisfy the requirements for status as a class representative under Fed.R.Civ.P. 23. *Compare Franks v. Bowman Transportation, Inc.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976) *with Kremens v. Bartley*, 431 U.S. 119, 97 S.Ct. 1709, 52 L.Ed.2d 184 (1977). If the district court is satisfied that the current named plaintiff will continue to adequately represent the interests of class members, we further direct that the court order the Secretary either to amend the challenged regulation or to change his application of, and procedure under, the regulation to provide relief to affected class members consistent with this opinion. Because limited resources are available for SSI and other income maintenance programs, we do not contemplate that the Secretary must make retroactive individual redeterminations of SSI eligibility in all cases where unearned income has been imputed in the past. *See Gray Panthers*, 453 U.S. at

48, 101 S.Ct. at 2642. Rather, we contemplate that the Secretary will submit to the district court for approval modifications in the regulations or procedures to be applied prospectively, which will impute unearned income attributable to the receipt of shelter or other basic necessities at prices below "market value" only to the extent that the unearned income represents additional resources available to the recipient (increased purchasing power) to meet his or her basic needs.[17] We believe that the regulation as applied must recognize *in some situations* the amount and distribution of the recipient's income among basic needs as a factor in measuring unearned income to be imputed. On remand, the district court may also redetermine the class, if necessary, and consider any other measures that will provide relief consistent with this opinion.

VACATED AND REMANDED.

---

17. Perhaps the presumed maximum benefit value ($83.13) would be a more acceptable measuring stick if it provided a ceiling on total rent (actually paid as well as imputed). *Cf.* 42 U.S.C. § 1382a(a)(2)(A)(i) (1976) (for individuals living in the household of another and receiving both food and shelter, value of food and shelter set at presumed maximum benefit amount, *i.e.*, $83.13, regardless of the actual value). This, however, is certainly a matter for the Secretary's discretion.