OPINION OF THE COURT
Robert F. Doran, J.
In deciding this claim against the estate by Eden Park Health Services, Inc., the court is confronted with a novel issue. Does a provider of medical services which has been receiving direct payment of no-fault benefits from a patient’s insurer have the right to settle a dispute with the insurer without notice to the patient or his estate and thereafter sue the patient or his estate for the balance due, where the release settling the dispute between the medical provider and the insurer specifically reserves to the medical provider all rights to proceed against the patient or his estate for the balance of any sums due? The court concludes that, under the facts of this case, the medical provider (hereinafter, the claimant) cannot sue the patient’s estate for the balance due.
*249 The decedent was involved in an automobile collision on December 12,1976 in which he suffered extensive injuries. In fact, he was in a comatose state until his death on September 19, 1978. The decedent had a child (Mrs. Merl Fletcher [a/k/a Merl Anderson]) who died 24 hours before the decedent, and there are no known distributees.
On April 13, 1977, the decedent was admitted to Eden Park Nursing Home, Inc., of Albany, New York. The admission agreement, which was admitted into evidence as claimant’s exhibit No. 2, states on the front side that the agreement was to be between Carl Anderson, as the patient, and/or Mrs. Merl Fletcher, as responsible party, and the claimant. On the back of the agreement, the patient’s name was written out, and, underneath, “by: Merl Anderson” was written. Under the portion designated for responsible party, the words “all state ins. go.” are printed. The agreement is witnessed on the back by James C. Straney, attorney for the estate, and dated April 7, 1977. The agreement was signed on the back by the nursing home representative on April 11, 1977.
The decedent’s ledger card in the nursing home reveals that $19,138.05 was paid by Allstate Insurance Company directly to the claimant. The only other payment ever received was $881 in Medicare benefits. The record does not reflect whether any valid assignment was ever executed by the decedent or by Mrs. Merl Fletcher, his daughter. The last payment from Allstate Insurance Company was received in April, 1978. From claimant’s exhibit No. 3 (denial of no-fault benefits claim form), it appears that Allstate Insurance Company took the position that the nursing care was no longer attributable to the automobile accident.
After the decedent died on September 19, 1978, the nursing home sought to communicate with attorney Straney in order to recover the balance due of $6,687.25. Attorney Straney contended that the claimant should either look to Allstate or file a claim with the estate. The claimant did two things.
First, on February 21, 1979, it sent a claim-against-the-estate notice to attorney Straney. At that point, no fidu *250 clary letters had been issued. The temporary letters were eventually issued on August 7, 1979.
Then, at the same time (February 21, 1979), the claimant issued a summons with notice against Allstate to recover the $6,687.25 on the ground that Allstate had breached a third-party beneficiary contract. That action was commenced without notice to the estate or to Mr. Straney. The lawsuit against Allstate was settled in May of 1980 by the payment of $3,000 to the claimant by Allstate. The release signed by Eden Park Health Services, Inc., stated that it “grants this relief to Allstate specifically reserving all of its rights to proceed against the Estate of Carl Anderson for the balance of any sums due.” The settlement was taken without the knowledge or consent of the estate or Mr. Straney.
The claimant thereafter commenced a Supreme Court action against the temporary administrator for the balance due of $3,687.25. The claimant, as plaintiff in that action, moved at Special Term for summary judgment. The Honorable John H. Pennock, Supreme Court Justice, denied the motion, holding that there were questions of fact raised and that the matter should be remanded to Saratoga County Surrogate’s Court. Justice Pennock signed an order to that effect on March 31, 1981, directing that the action be transferred for determination in the pending accounting proceeding.
Paragraph 18 of the admission agreement reads as follows: “18. Notwithstanding any collateral agreements to the contrary whereby payment on behalf of the Patient is or has been made by medicaid, medicare or otherwise, the Patient and/or Responsible Party agrees to be fully responsible for the ultimate bill. In the event of discontinuance of payments by medicare or other third party insurance, the Patient and/or Responsible Party shall be given due notice thereof, after which continuation of payments shall be arranged for and made by the Patient and/or Responsible Party at the rate then being charged by the institution to a private patient. The institution shall not be responsible for first instance acceptance and admission of a Patient under medicaid, medicare or otherwise, followed by disenrollment as of the date of first admission or at a subsequent *251 date for reasons established by the various funding institutions. Non-payment, whether by medicaid, medicare or other programs, or by the Patient and/or Responsible Party shall necessitate termination of patient status, upon due notice to the Patient’s physician.”
The claimant relies heavily on section 15-104 of the General Obligations Law, which provides in relevant part as follows: “the obligee’s release or discharge of one or more of several obligors, or of one or more of joint, or of joint and several obligors shall not discharge co-obligors, against whom the obligee in writing and as part of the same transaction as the release or discharge, expressly reserves his rights”.
The claimant cites Plath v Justus (33 AD2d 833, affd 28 NY2d 16), wherein it was held that a release granted by a decedent against the driver of an automobile, which release specifically reserved the decedent’s rights against the owner, did not operate to release the owner. The release was construed as a covenant not to sue. The estate merely argues that section 15-104 of the General Obligations Law is not relevant to the issues and that, since the claimant relied upon Allstate Insurance Company, it must look solely to Allstate for payment.
The Attorney-General, appearing in this proceeding on behalf of the State Comptroller by virtue of the fact that there are no known distributees, contends that the release executed between the claimant and Allstate was not authorized by law and should be set aside. The Attorney-General cites 11 NYCRR 65.15 (d) (6) and 65.15 (i) as authority that a provider of medical service can submit billing directly to an insurer for first-party benefits as long as authorized to do so by the applicant or his legal representatives. (Since the accident happened before Dec. 1, 1977, the proper citation is 11 NYCRR 65.6 [d] [6]; [i].) The State concedes that a question might arise as to whether there was a proper assignment for direct payment in this case, but, because the actual facts make it appear that everyone knew the money was being paid directly, the claimant should be estopped from denying an effective assignment. The court agrees to such estoppel.
*252 The State then argues that, assuming an effective assignment, it would appear that the claimant’s undertaking to commence a lawsuit for first-party benefits against Allstate made the claimant the sole party responsible for collection of those first-party benefits from Allstate.
The State next argues that, since an insurer has a statutory obligation to pay first-party benefits until the maximum payments are exhausted (here, there is no question but that they were not exhausted), the injured party is not intended to be a co-obligor within the meaning of section 15-104 of the General Obligations Law. The State also points out that, under 11 NYCRR 65.15 (o), there shall be no settlement or release, expressed or implied, for mandatory or optional personal injury protection benefits. It therefore concludes that this court should declare the compromise agreement null and void and find that, as a proper assignee of the estate, the claimant must look solely to Allstate. The court finds that it cannot declare the agreement between the claimant and Allstate Insurance Company null and void since Allstate is not a party to this proceeding. The court also feels that the regulations prohibiting settlements or releases would not prevent the settlement and release here in question as between the claimant and Allstate but rather would have the effect of preventing the claimant and Allstate from jeopardizing any rights the injured person may have against the insurer through collateral estoppel (cf. Vazquez v Aetna Cas. & Sur. Co., 112 Misc 2d 125). It would also have the effect of preventing a lump-sum settlement for all future medical expenses not covered by the settlement. Moreover, since the accident occurred prior to December 1,1977, the proper regulation is 11 NYCRR 65.6 (o) — not 65.15 (o); the wording, however, of both sections is identical.
The court nevertheless concludes that the claimant cannot prevail here. In the court’s view, a key to deciding this matter is the admission agreement itself, which requires close analysis. It is extremely difficult to tell who placed which handwriting on the agreement and when. Obviously, several different inks were used. It is also obvious that various handwritings and signatures were put on the agreement on different dates. It seems clear that the claim *253 ant was attempting to hold Mrs. Merl Fletcher (a/k/a Merl Anderson) as a responsible party. Clearly, the claimant was in a bind. The patient was in a comatose condition and could not sign on his own behalf. There was no fiduciary or conservator appointed for Mr. Anderson at that time, and the claimant was obviously attempting to- hold Mrs. Merl Fletcher directly responsible in her own right. However, close examination of the back side of the agreement indicates that “Merl Anderson” did not sign as a responsible party in her own right. She was merely attempting to sign on behalf of the patient himself. However, she had no legal authority to bind the patient. From the inks used, it is apparent that Mr. Straney was the one who printed “all state ins. co.” on the line for responsible party. It would appear that he did so on April 7, 1977 and that “Merl Anderson” had signed the back side by that date. It is also apparent that the claimant's representative did not sign until later. Since the representative is an agent of the claimant, the claimant is bound by her signature, and it is therefore clear that the claimant signed knowing that Mr. Carl Anderson himself had not signed the agreement and that “Merl Anderson” had not signed as a responsible party in her own right. There is nothing in the record to show that she had legal authority to sign on behalf of Mr. Anderson in a fiduciary capacity such as a guardian or a conservator. Thus, the court concludes that there is no valid express agreement binding the estate.
The court is not unsympathetic to the problems of the claimant. Neither is it unsympathetic to the problems of a close relative such as Mrs. Merl Fletcher, who did not wish to become a direct responsible party and, in the judgment of this court, did not. Perhaps what is needed in a case such as this, when a patient is comatose and cannot sign on his own behalf and there is no fiduciary who may sign on his behalf, is an amendment to the General Obligations Law which would permit a distributee of such person to sign the agreement and bind the patient and his estate to any contractual obligations.
Having concluded that there is no valid express agreement, the claimant could recover from the estate only on a *254 theory of implied contract in law (see Edson v Hammond, 142 App Div 693).
Generally, a person who has supplied things or services to another, although acting without the other’s knowledge or consent, is entitled to restitution therefor from the other if he acted unofficiously and with intent to charge therefor, and the things or services were necessary to prevent the other from suffering serious bodily harm or pain, and the person supplying them had no reason to know that the other would not consent to receiving them, if mentally competent, and it was impossible for the other to give consent or, because of extreme youth or mental impairment, the other’s consent would have been immaterial (22 NY Jur 2d, Contracts, § 523). The facts of this case, inability to consent because of a comatose state resulting from an injury, clearly come within this general rule, and the claimant would ordinarily be able to recover from the estate, even in the absence of an express agreement.
However, the facts of this case also present a question of whether or not there was a novation of debtors such that the claimant can look only to Allstate — at least to the extent of its $50,000 no-fault liability.
The court concludes that there was a novation such that the claimant could look only to Allstate until such time as the cost of services might have exceeded the $50,000 no-fault limitation. Therefore, the claim is denied.
Because there is no valid express written agreement, the novation need not be in writing (cf. Central Trust Co. Rochester v Bagliore, 78 AD2d 764). Also, the express consent of the original debtor to the assumption of his debts by a third party is not essential to a novation. Such consent of the debtor may be implied by conduct (Schloss Bros. & Co. v Bennett, 260 NY 243, 248).
However, the assent to the substitution by the creditor (here, the claimant) must be established (Schloss Bros. & Co. v Bennett, supra, at p 248). Consent has been indicated by the claimant by its bringing of the action solely against Allstate (see Automatic Strapping Mach. Co. v Twisted Wire & Steel Co., 159 App Div 656).
*255 The fact of the lawsuit by the claimant creditor solely against Allstate and the entire course of conduct by the claimant creditor, including the signing of the admission agreement by the claimant with Allstate listed as responsible party on the back side, amounts to an estoppel, denying the claimant the right to assert that it did not consent to the novation of debtors (see Voss u Luzzo, 149 Mise 65).
Thus, since the estate of the patient was not obligated to the claimant under an implied contract in law at the time it settled its lawsuit against Allstate, the attempted reservation of rights in the general release to sue the estate for the balance did not bring into play section 15-104 of the General Obligations Law insofar as the estate is concerned.
Submit decree.