**Mary RUPPERT, Angela Mauro, Alan Green, Cheryl Karnett, Jocelyn Hill, Thomas Ferguson, Edward and Rose Faicco, Victoria Shaw, Peter Lo Brutto, Jacqueline Ferguson, Aaron Green, Appellants,**

v.

**Otis BOWEN, Secretary of the United States Department of Health and Human Services, and Cesar Perales, as Commissioner of the New York State Department of Social Services, Appellees.**

**Nos. 495, 563, Dockets 88–6018, 88–6176.**

United States Court of Appeals, Second Circuit.

Argued Dec. 7, 1988.

Decided March 29, 1989.

Charles Robert, Robert, Huber, Lerner & Bigler, Rockville Centre, N.Y. (Laura Enteen, Long Island Advocacy Center, New Hyde Park, N.Y., of counsel), for appellants.

Michelle J. Ritholz, Sp. Asst. U.S. Atty. (Andrew J. Maloney, U.S. Atty. for the Eastern District of New York, Robert L. Begleiter, Anne E. Stanley, Asst. U.S. At-

**1174**

tys., of counsel), for appellee Secretary of Health and Human Services.

Mary Fisher Bernet, Asst. Atty. Gen. (Robert Abrams, Atty. Gen. of the State of New York), for appellee Cesar Perales.

Ellen M. Saideman (Herbert Semmel, of counsel), for amicus curiae New York State Comm'n on Quality of Care for the Mentally Disabled.

Before OAKES, Chief Judge, KAUFMAN and CARDAMONE, Circuit Judges.

OAKES, Chief Judge:

Eleven appellants challenge the method used by the Social Security Administration (SSA) to calculate their benefits under the Supplemental Security Income (SSI) program, which provides income to the elderly, blind, and disabled.[1] They appeal a decision of the United States District Court for the Eastern District of New York, Leonard D. Wexler, Judge, and we assume familiarity with Judge Wexler's detailed opinion. *Ruppert v. Secretary, HHS*, 671 F.Supp. 151 (E.D.N.Y.1987). There, Judge Wexler considered a variety of arguments presented by the appellants and by other plaintiffs who did not appeal because they were successful before him. The disputes here are centered around the valuation of food, clothing, and shelter that SSI recipients' family members provided them. We affirm in large part. We will present an overview of the regulatory framework and of each appellant's factual situation before addressing in detail the legal questions.

A. *The Regulatory Framework*

The SSI program is authorized by the labyrinthian provisions of Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383c (1982 & Supp. IV 1986). Section 1382(a) defines "eligible individual" as someone who is aged, blind, or disabled and whose income and resources are less than amounts specified. An eligible individual's yearly income cannot exceed the federal benefit rate, and her resources cannot exceed other specified amounts, which vary depending on whether she lives with a spouse, whether the spouse is eligible, and the year in question. For example, the maximum resource amount is now $3,000 for an eligible person living with an ineligible spouse. 42 U.S.C. §§ 1382(a)(1)(B), 1382(a)(3)(A) (Supp. IV 1986). The benefit is payable at a fixed annual rate which is reduced by the amount of other income the individual receives, *id.* § 1382(b), although certain types of income are excluded from consideration, *id.* § 1382a(b). The benefit in 1986 was $336 per month, 20 C.F.R. § 416.410, although the benefit is subject to cost-of-living increases, 42 U.S.C. § 1382f, and may well be higher today.

Section 1382a defines "income" to include both earned and unearned income, and it defines "unearned income" to include "support and maintenance furnished in cash or in kind." 42 U.S.C. §§ 1382a(a); 1382a(a)(2)(A). The receipt of support in kind affects benefit calculations in one of two ways. If an individual receives both food and shelter from someone in whose household she lives, the "one-third reduction rule" applies. The recipient's benefit payments are reduced because she is regarded as having income equal to one-third of the federal benefit rate in addition to that received from any other source. *Id.* § 1382a(a)(2)(A); 20 C.F.R. §§ 416.1130(c), 416.1131. Someone who does not pay a pro rata share of her household's expenses is considered to be living in someone else's "household." 20 C.F.R. §§ 416.1132–.1133. When the one-third reduction rule applies, any contributions the SSI recipient makes toward household expenses are ignored, unless, of course, those payments equal a pro rata share of the household's expenses, in which case the one-third reduction rule would not apply at all. *Id.* § 416.1133.

---

**1.** Appellants argue that Cesar Perales, the Commissioner of the New York State Department of Social Services, is an appellee in this action, but he did not oppose the appellants' arguments in any of the cases here appealed. We note that in his brief he reaffirms his support, which he previously expressed to the Secretary of HHS, for the appellants' arguments that we should adopt *Hickman v. Bowen,* 803 F.2d 1377 (5th Cir.1986), and *Jackson v. Schweiker,* 683 F.2d 1076 (7th Cir.1982).

If an individual receives in-kind support without meeting the terms of the one-third reduction rule, SSA applies what may be called the "presumed maximum value" (PMV) rule. *Id.* § 416.1130(c). The PMV is one-third of the federal benefit rate plus the "general income exclusion," which is $20 per month. *Id.* §§ 416.1140, 416.-1124(c)(12); 42 U.S.C. § 1382a(b)(2)(A) (Supp. IV 1986). The recipient is assumed to have additional income equal to the PMV. 20 C.F.R. § 416.1140. When the PMV rule is used, however, the recipient has the opportunity to prove that the actual value of the support is less than its presumed value. *Id.* § 416.1140(a)(2). Actual value is defined as the current market value or the amount paid by the provider for the item. *Id.*

The threshold for application of the two valuation rules, one-third reduction and PMV, is a determination that the recipient received "in-kind support and maintenance." The regulations explain:

> In-kind support and maintenance means any food, clothing, or shelter that is given to you or that you receive because someone else pays for it.... You are not receiving in-kind support and maintenance in the form of room or rent if you are paying the amount charged under a business arrangement. A business arrangement exists when the amount of monthly rent required to be paid equals the current market rental value....

*Id.* § 416.1130(b). When someone pays less than market value for food, clothing, or shelter and the PMV rule applies, she has "in-kind support and maintenance" income equal to the PMV amount, or whatever lesser amount she can prove to be the actual value of the bargain. No matter how much support the recipient receives, however, the PMV is the maximum that can be deducted from her benefits.

There is a special rule for recipients in the three states within the jurisdiction of the Court of Appeals for the Seventh Circuit, which decided *Jackson v. Schweiker*, 683 F.2d 1076 (1982):

> In the States in the Seventh Circuit (Illinois, Indiana, and Wisconsin), a business arrangement exists when the amount of monthly rent required to be paid equals or exceeds the presumed maximum value described in § 416.1140(a)(1). In those States, if the required amount of rent is less than the presumed maximum value, we will impute as in-kind support and maintenance, the difference between the required amount of rent and either the presumed maximum value or the current market value, whichever is less.

20 C.F.R. § 416.1130(b). Since the "presumed maximum value described in § 416.1140(a)(1)" is one-third of the federal benefit rate ($336 in 1986) plus $20, i.e., $132 per month in 1986, an SSI recipient in the Seventh Circuit could not have imputed income from below-market rent unless her actual rent was quite low.

## B. *The Factual Setting*

There follows (in alphabetical order) a brief description of the individual appellants' situations as they existed when evaluated by the SSA:

Rose Faicco and her now deceased husband, Edward Faicco, were both over age sixty-five. An administrative law judge (ALJ) determined that they were each overpaid $262.20 between November 1982 and March 1983, during which period they rented a house in Franklin Square, New York, from their daughter, who did not live there. Although the house's monthly expenses were $951, the Faiccos paid rent of $350 per month, which was reduced to $250 per month when the daughter's variable rate mortgage decreased. The ALJ found that the Faiccos had either received subsidized rent or, because they did not pay their pro rata share of the expenses, lived in their daughter's household. Because the value of the housing was $951, the ALJ held, each of the Faiccos had PMV income resulting in overpayment of benefits. Judge Wexler accepted the ALJ's findings, including the finding that the Faiccos were not without fault in obtaining the overpayments and hence ineligible for waiver of adjustment or recovery of the sum overpaid. *Ruppert*, 671 F.Supp. at 182–83.

Jacqueline and Thomas Ferguson, who are brother and sister, lived with their fa-

ther in a four-room condominium in Medford, New York. *Id.* at 181–82, 191–92. Thomas was disabled due to deafness, while Jacqueline had epilepsy. An ALJ found that Jacqueline was subject to the one-third reduction rule because she paid only $100 per month toward the total household expenses of $658. The ALJ rejected Jacqueline's argument that her father had lent her $169 per month in food and rent, even though she had signed an agreement to pay $269 per month to her father. Although the ALJ relied on the fact that no cash was lent, Judge Wexler affirmed because he determined that the agreement was illusory and that she was not "without fault." *Id.* at 191–92.

Thomas Ferguson had signed a similar written agreement to pay his father $269 per month for food and lodging. An ALJ found that Thomas was not actually paying a proportionate share of the household's expenses. Judge Wexler accepted the ALJ's determination that Thomas was therefore subject to the one-third reduction rule, noting that even the amount of rent he agreed to pay would not cover his share of the condominium expenses and that it was "questionable" whether the agreement had ever been enforced. *Id.* at 181–82.

Aaron Green, who is retarded, lived with his parents and paid them for rent and food. Judge Wexler accepted an ALJ's determination that although Aaron met the federal definition of living in his own household (because he paid enough expenses), Aaron was living with others for state supplemental assistance purposes (because he did not prepare his own meals separately). *Id.* at 192.

Alan Green, who apparently is unrelated to Aaron, was disabled by heart and brain impairments and has died during this appeal. He lived with his parents and sister in Oceanside, New York. He had a written agreement to pay his mother $100 per month for rent and $125 per month for food. There was evidence that Alan's mother had stated on an SSA form that she would charge a stranger $135 for lodging. Judge Wexler accepted as supported by substantial evidence the ALJ's determina-

tion that Alan had received $35 per month of in-kind income because the market value of his room exceeded what he paid. *Id.* at 178–79.

Jocelyn Hill, who has multiple sclerosis, sold her home in 1981 for net proceeds of $15,540.24. Judge Wexler accepted as properly supported an ALJ's findings that Hill was ineligible for SSI because her resources exceeded $1,500. Hill was unable to convince the ALJ or the district court that she had disbursed substantial portions of the sale proceeds in payment of debts to her father or sister. The ALJ, however, decided that she was without fault and decided to waive recoupment of past benefits paid. *Id.* at 180–81.

Cheryl Karnett, who is mentally retarded and autistic, lived with her parents in Uniondale, New York. Her mother executed a rental agreement as both Cheryl's agent and her landlord. An ALJ agreed that the contract was enforced insofar as it provided that Cheryl would pay rent of $169 per month (it also provided for food payments of $120 per month). The ALJ, however, found that Cheryl had unearned income of $11 per month because her room's market value was $180. The ALJ also held that Cheryl had received unearned income of $25 per month in occasional meals her family gave her which were not paid for out of her own funds. Judge Wexler affirmed as to both the $11 housing payment and the $25 value of the food, holding that Cheryl was mentally incapable of incurring liability for a loan of food, although the fact that the loan was not made in cash was immaterial. *Id.* at 179–80.

Peter Lo Brutto is retarded and lived with his mother in a subsidized rental unit in Manhattan. Like Aaron Green, he challenges an ALJ's determination that he was living in his own household for federal assistance purposes while he was living with others for state assistance purposes. The holding of the district court was the same as in Aaron Green's case: Judge Wexler accepted the ALJ's determination. *Id.* at 190–91.

Angela Mauro, who has phlebitis, was dependent on her relatives for support until

she received her first SSI payment of approximately $3,000, which was retroactive. She lived in Lake Grove, New York, on one floor of her brother's home. An ALJ held that Mauro's benefits should be reduced by the amount of the PMV, since her family provided her food and other necessities prior to the receipt of the check. He accepted Mauro's argument that her rent had not been free, since she had paid $2,000 of her SSI payment to her brother for past due rent, and she intended to repay another $1,000. Her argument that she was indebted to her relatives for food and other necessities, however, was rejected, and Judge Wexler agreed that Mauro had received income in the form of food, gas, electricity, and heating fuel. *Id.* at 178.

Mary Ruppert is retarded and lived with her parents. Judge Wexler held that she had received unearned income when her parents supported her prior to the commencement of her SSI payments. He rejected for lack of evidence of an enforceable agreement Ruppert's claim that she was indebted to her parents for the support. *Id.* at 177–78.

Victoria Shaw is autistic and lived with her parents. She had no document evidencing a rental agreement, although her mother, the payee for her checks, did fill out some "rental receipts" which looked suspicious to the ALJ. Judge Wexler agreed with an ALJ that Victoria was incapable of undertaking rental liability to her parents, so she had received income when she lived with them. *Id.* at 185–86.[2]

## DISCUSSION

■ Appellants basically make five arguments. Some of the arguments are applicable to some of the appellants, none are applicable to all, and one is applicable to none. This unusual situation, along with the somewhat confusing briefs, must be due in considerable part to the frustration that we sense appellants' counsel must experience in contending with the SSA on narrow, individualized battlegrounds instead of in broad, sweeping terms, espe-

cially given the SSA's refusal to acquiesce in certain judicial decisions. However sympathetic we might be to his frustration, which must be compounded by the disparity between the resources at his command and those available to the SSA, we must be guided in the decisionmaking process by the usual prudential rules. Appellants' counsel would have the SSA apply circuit court decisions nationally. He goes so far as to detect unethical conduct on the part of government counsel, who, he argues, mislead us with what he calls "Janus-faced," *see Hidalgo v. Bowen*, 822 F.2d 294, 299 (2d Cir.1987), statements regarding the SSA's acquiescence policy. *See* Estreicher & Revesz, *Nonacquiescence by Federal Administrative Agencies*, 98 Yale L.J. 679, 681 (1989) (defining "agency nonacquiescence" as the "selective refusal of administrative agencies to conduct their internal proceedings consistently with adverse rulings of the courts of appeals"). The SSA evidently considers itself bound only by the decisions of the Supreme Court and by those decisions of the applicable circuit court to which the SSA has not announced its objections. *See* Department of Health and Human Services, *HHS News* (June 3, 1985) (press release); Office of Hearings and Appeals Staff Guides and Programs Digest Bulletin No. III–I, at 4 (Aug. 22, 1986); *Ruppert*, 671 F.Supp. at 169–71; Estreicher & Revesz, *supra*, 98 Yale L.J. at 694–99. Although appellants suggest that the SSA has promised to apply circuit court decisions nationally and argue that it should be required to do so, we affirm Judge Wexler's determination that the SSA's acquiescence policy applies only within circuits.

■ We must also dispose of the appellants' suggestion that we should somehow make applicable to the circuit as a whole the district court ruling—favorable to plaintiffs—that loans may be made in kind as well as in cash, as held by the Fifth Circuit in *Hickman v. Bowen*, 803 F.2d 1377 (5th Cir.1986). The regulations exclude the proceeds of loans from income.

**2.** The parties to the other cases covered in Judge Wexler's opinion did not appeal except that in

one case, *Zimmerman*, 671 F.Supp. at 186, there was a stipulation for remand pending appeal.

20 C.F.R. § 416.1103(f) ("Money you borrow ... is not income."). They do not, however, state whether loans of support and maintenance made in kind should be excluded from income. The administrative law judges who adjudicated appellants' claims believed that loans could be made only in cash. Judge Wexler, however, found that in-kind loans should also be excluded from income calculations. He did so, following the reasoning of the Fifth Circuit's holding in *Hickman v. Bowen*, over the Secretary's objections. *Ruppert*, 671 F.Supp. at 167–68.

The Secretary chose not to appeal this portion of Judge Wexler's decision. Appellants strenuously urge that this decision was made because the SSA wanted to avoid the precedential effect of an appellate decision in appellants' favor. Much as we might be tempted to follow the suggestion that we "adopt the legal reasoning" of *Hickman*, in view of the SSA's history of uncooperativeness in this circuit, *see, e.g., Hidalgo*, 822 F.2d at 294 (describing the SSA's ignoring the treating physician rule laid down by this court as "liv[ing] in an administrative 'never-never' land"), it would be judicially imprudent to decide an unappealed issue, *cf. Ashwander v. TVA*, 297 U.S. 288, 341, 56 S.Ct. 466, 480, 80 L.Ed. 688 (1936) (inappropriate to consider constitutional challenge brought by plaintiffs lacking standing) (Brandeis, J., concurring), and we decline to do so. By our silence, however, we do not mean to invite the Secretary to appeal a similar ruling in a later case or to seek to avoid as to individual claimants the precedential effect of Judge Wexler's well reasoned opinion in the Eastern District or elsewhere in the Second Circuit.

■ Although we are not called upon to decide the *Hickman* issue, two issues concerning loans are on appeal here. First, several of the appellants urge us to reject the district court's determinations that they received gifts, rather than loans, of support from their families. For most of these appellants, the disputes concern Judge Wexler's findings that there was substantial evidence to support administrative law judges' determinations that loan agreements were illusory. Judge Wexler reviewed the records quite carefully and, in fact, ruled on this issue in favor of several plaintiffs who did not appeal. We hold, however, that the district court should remand the cases of those who appeal on this issue to the administrative law judges for new factfinding. When the ALJs made their determinations, they believed that loans could not be made in kind. If they had known the applicable law, their determinations might have been completely different. Because the district court has determined that loans can be made in kind, a fresh inquiry is appropriate.

■ The second loan question concerns the district court holding that two of the appellants who are autistic, Shaw and Karnett, could not legally have received certain loans because they were incapable, under New York law, of entering into binding agreements. (Judge Wexler, however, did accept the finding that Karnett had a loan for rent; the record reveals that her mother had executed a loan agreement in which her mother acted as both her agent and her landlord.) *Ruppert*, 671 F.Supp. at 180, 185–86. We reverse the legal determinations against Shaw and Karnett. Under New York law, an incompetent is liable under an implied agreement for the reasonable value of necessities. *In re Estate of Anderson*, 119 Misc.2d 248, 254, 462 N.Y.S. 2d 589, 593 (Sur.1983) (supplier entitled to restitution if intended to charge for what was supplied) (citing 22 N.Y.Jur.2d Contracts § 523 (1982)); *In re Estate of Allen*, 53 Misc.2d 1032, 1033, 281 N.Y.S.2d 112, 114 (Sur.1967); *In re Estate of Keeling*, 148 Misc. 798, 801, 266 N.Y.S. 441, 444–46 (Sur.1933). Whether a loan existed, then, depends on the families' intent rather than the existence of paper documentation. We remand these cases to the trial court.

■ We pass, then, to the appellants' major argument, which is that the Secretary's treatment of the difference between the fair market rental value of SSI recipients' housing and the rent actually paid therefor as unearned income is erroneous. Judge Wexler accepted the SSA's ap-

proach. *Ruppert,* 671 F.Supp. at 169–70. Appellants would have us follow the reasoning of *Jackson v. Schweiker,* 683 F.2d 1076 (7th Cir.1982), in which the recipient paid her sister $145, or 77% of her monthly federal cash benefits, for shelter with a market rental value of $250. The Seventh Circuit held that it was incorrect to attribute to Jackson the $105 per month difference between the market value of her housing and the rent she paid (or, more precisely, the PMV amount, which was $83.13). The court reasoned that Jackson's purchasing power had not been increased by $83.13 because the marginal utility or incremental value of the bargain on housing to a person already devoting 77% of her cash income to shelter "although greater than zero, is far less than the excess of market value over actual rent." 683 F.2d at 1082. *Jackson's* holding, appellants remind us, has been incorporated into an SSA regulation, quoted above at page 2364, which applies only to the Seventh Circuit states. Under that regulation, there is a "business arrangement," rather than imputed income from below-market rent, if the rent is at least equal to the PMV. 40 C.F.R. § 416.1130(b).

Appellants acknowledge that in another case litigated by appellants' counsel, our court, not "find[ing] the *Jackson* analysis applicable," found other circuits' decisions supportive of the holding that in-kind income such as below-market rent was "includable in countable income since it constitutes actual economic benefit." *Rothman v. Schweiker,* 706 F.2d 407, 410 (2d Cir.) (per curiam), *cert. denied,* 464 U.S. 984, 104 S.Ct. 428, 78 L.Ed.2d 362 (1983). The district court held that the *Rothman* decision "preclude[d] it from applying *Jackson* to the *Ruppert* cases in the manner which plaintiffs desire" because the Second Circuit "indicated" in *Rothman* "that it does not find *Jackson* persuasive." *Ruppert,* 671 F.Supp. at 170. Appellants argue, however, that the *Rothman* court "merely distinguished [the case's] *facts*" from

*Jackson's,* as *Jackson* had distinguished its facts from those of the circuit court decisions relied upon by *Rothman* that upheld the constitutionality of the statute and regulations.[3] *Jackson,* 683 F.2d at 1082–83; *Rothman,* 706 F.2d at 410. Appellants point out that the Solicitor General's brief successfully opposing the grant of certiorari in *Rothman* said, irrespective of the positions taken by the Secretary before this court and the *Jackson* court at various stages in each case:

> Petitioners rely heavily on *Jackson v. Schweiker,* 683 F.2d 1076 (7th Cir.1982), which they claim conflicts with the decision below and several other court of appeals decisions. However, *no such conflict exists.*

> In *Jackson,* the class representative had her benefits terminated by application of the presumed maximum value regulation when it was determined that she received a rental subsidy from her sister although she nonetheless was paying 77% of her income for rent. *The court of appeals expressly "accept[ed] the general validity of the regulation as applied in many situations" (id. at 1079 n. 2), but held that, on the particular facts of* Jackson, *it was inappropriate to include the rental subsidy as countable income* because "where a very large percentage of income * * * is committed to shelter costs *before* termination of SSI, it flies in the face of reality to conclude that 'unearned income' in the form of subsidized shelter * * * is actually available to the recipient." *Id.* at 1085 (emphasis in original). *The court of appeals below correctly stated that the rule announced in* Jackson *was inapplicable here and instead relied on the decisions in other circuits upholding the regulations.... Indeed, the* Jackson *court itself recognized the limited nature of its holding, and it explicitly stated that its decision did not conflict with the court of appeals decisions up-*

---

3. Appellants also rely on a dissent (in a case involving unearned income from Veterans Administration benefits) which in turn cited *Jackson's* "purchasing power" emphasis in describ-

ing the SSI statutes' basic purpose of increasing purchasing power to a minimum poverty level. *Robinson v. Bowen,* 828 F.2d 71, 73 (2d Cir. 1987) (Oakes, J., dissenting).

holding the regulations, 683 F.2d at 1079 n. 2.

Brief for Respondent at 6–7, *Guigno v. Heckler*, 464 U.S. 984, 104 S.Ct. 428, 78 L.Ed.2d 362 (1983) (denial of certiorari in *Rothman*) (emphasis added).

Much ado is made of the alleged shilly-shallying of SSA thereafter, in its own regulations, before the House of Representatives and in the courts, as to the import of the *Jackson* decision. But appellants' most cogent argument is that if they spend a very large percentage of their cash benefits on rent, then, as per the "purchasing power" test in *Jackson*, they do not have the purchasing power to secure other basic needs and thus do not receive the "actual economic benefit" from below-market rents that is discussed in *Rothman*.[4]

The Secretary argues that even under the one-third reduction rule and the PMV rule, a maximum of one-third of the federal benefit rate is deducted and that not to impute in-kind income to SSI beneficiaries with generous relatives is to "penalize[ ]" other less fortunate individuals (citing *Antonioli v. Harris*, 624 F.2d 78, 81 (9th Cir.1980)). We fail to see the penalty, though we recognize a certain inequality—those with generous relatives are somewhat better off than those without, though they are all blind, aged, or disabled, and sufficiently lacking in resources and income as to be otherwise eligible for SSI benefits.

In the end the Secretary relies on the argument that to hold for appellants is to "overrule" *Rothman* and "adopt" *Jackson*, and that we are not permitted to do the first and we are not required to do the second. While *Rothman* is ambiguous, we construe it as did the Solicitor General: It upheld the facial validity of the statute and regulations that were challenged in the district court, *Glasgold v. Secretary*, 558 F.Supp. 129, 141–44 (E.D.N.Y.1982), just as did the cases cited in *Rothman*. *Rothman*, 706 F.2d at 410 (citing *Buschmann v. Schweiker*, 676 F.2d 352, 355 (9th Cir. 1982); *Nunemaker v. Secretary, HEW*, 679 F.2d 328, 332–33 (3d Cir.1982); *Usher v. Schweiker*, 666 F.2d 652, 655–57 (1st Cir.1981); and *Kimmes v. Harris*, 647 F.2d 1028, 1033–34 (10th Cir.), *cert. denied*, 454 U.S. 898, 102 S.Ct. 400, 70 L.Ed.2d 214 (1981)). *Jackson*, on the other hand, construed the regulations as applied to specific facts: 77% of benefits were paid for rent in that case. Neither the cases relied upon by *Rothman* nor *Rothman* itself engaged in *Jackson*'s economic analysis, though in *Kimmes* the recipient paid only 37% of her benefits for housing, 647 F.2d at 1030; in *Nunemaker* the recipient paid 26%, 679 F.2d at 329, 330 n. 3; and in *Usher*, the unmarried plaintiffs appear to have paid between 45% and 66%, 666 F.2d at 655 n. 8.

What this means for the appellants here is that if the proportion of income that they expend on shelter is so great that "it flies in the face of reality to conclude that 'unearned income' in the form of subsidized shelter ... is 'actually available' to the recipient," *see Jackson*, 683 F.2d at 1085, the unearned income should be disregarded. This requires a remand in the cases of Alan Green, Cheryl Karnett (as to her $11 in-kind rent subsidy), and Edward and Rose Faicco, especially in light of the fact that the appellants' monthly benefit receipts do not appear in the record on appeal. The district court should determine whether the imputed income reflected any "actual eco-

---

4. As we noted in *Rothman*, the Secretary's general regulations regarding income have changed somewhat since *Jackson* was decided. *See Rothman*, 706 F.2d at 410 n. 7. *Jackson* relied on the fact that the imputed income calculations were incompatible with "the Secretary's basic regulations requiring, as a condition of imputation, the *actual availability* of income to meet *basic needs*," 683 F.2d at 1086 (emphasis added). *Jackson* cited two regulations. *Id.* at 1079. One of them defines in-kind income as that which an individual can apply to meet his basic needs, and it is still in effect today. 20 C.F.R.

§ 416.120(c)(2) (1988); *see also id.* § 416.1102(a) (1980) (slightly different previous version cited by *Jackson*, 683 F.2d at 1079). The other regulation, which no longer appears, provided that "[i]n determining the amount of unearned income the amount actually available to the individual is considered." 20 C.F.R. § 416.1120 (1980). This change in the regulations is not controlling, both because the Secretary does not rely on this change and because we remand for determination whether *Rothman*'s actual economic benefit test was met rather than deciding to adopt *Jackson* directly.

nomic benefit." The regulations used in the Seventh Circuit might provide a good indication of that, though we do not necessarily require their adoption as a matter of law.

One final question requires attention. The claims of two of the appellants, Peter Lo Brutto and Aaron Green, are based solely on the proposition that since they are classified as living in their own households for purposes of entitlement to SSI benefits, they must be similarly classified for purposes of entitlement to New York State Optional State Supplementation (OSS) benefits. The district court affirmed the Secretary's rejection of this argument. 671 F.Supp. at 163–65. When Congress authorized the states to supplement the federal payment to reflect varying costs of living, it left each state "completely free either to provide no supplementation of Federal assistance payments or to supplement those payments to whatever extent it [found] appropriate in view of the needs and resources of its citizens." H.R.Rep. No. 92–231, 92d Cong., 2d Sess. (1971), *reprinted in* 1972 U.S.Code Cong. & Admin.News 4989, 5185; *see also* 42 U.S.C. § 1382e (regarding state supplemental assistance generally).

New York State provides an optional state supplement. N.Y.Soc.Serv.Law § 207 (McKinney 1983); *see also Rothman v. Schweiker,* 706 F.2d at 409. The State's statutory definition of "living with others," N.Y.Soc.Serv.Law § 209(3)(b), is broader than the federal "living in another person's household" category, 20 C.F.R. §§ 416.-1132–.1133. *See Glasgold,* 558 F.Supp. at 139 n. 7. Thus, the State provides reduced benefits to some individuals who are in the state "living with others" category but are not subject to the one-third reduction rule applied to recipients in the federal "living in another person's household" category. *Id.* Specifically, the OSS payment may be reduced if the eligible individual is "living with others," which is defined as living in a private household composed of an eligible individual or eligible couple and at least one other person. N.Y.Soc.Serv.Law § 209(3)(b). Although the federal defini-

tion of "living in another person's household" depends on different criteria—for example, the failure to pay a pro rata share of the household's expenses—the federal definition does not control the state program. *See* 20 C.F.R. §§ 416.1132–.1133 (federal definition).

The district court found that Peter Lo Brutto and Aaron Green shared food purchase and preparation with family members, and we agree that there was substantial evidence to support the Secretary's decisions. *See Ruppert,* 671 F.Supp. at 190, 192. Hence, there were multi-person households for state benefit purposes, regardless of the Secretary's determination that Green and Lo Brutto were living in their own households for federal benefit purposes.

Having reviewed appellants' other arguments, we find that they are without merit or not properly raised at this time. Affirmed in part, reversed in part, and remanded.