**Mollie M. RAGSDALE and John T. Ragsdale, Plaintiffs,**

v.

**Kenneth S. APFEL, Commissioner of Social Security,[1] Defendant.**

**No. CIV.A. 3:97CV100.**

United States District Court, E.D. Virginia, Richmond Division.

March 30, 1998.

Kathryn L. Pryor, Central Virginia Legal Aid Society, Inc., Richmond, VA, for Plaintiffs.

---

1. During the pendency of this action, Kenneth S. Apfel was appointed Commissioner of Social Security, successor in office to Shirley S. Chater. Pursuant to Fed.R.Civ.P. 25(d), therefore, Apfel is substituted as the defendant in this action.

Debra J. Prillaman, United States Attorney's Office, Richmond, VA, for Defendant.

## MEMORANDUM OPINION

PAYNE, District Judge.

The plaintiffs, John T. and Mollie M. Ragsdale ("the Ragsdales"), filed this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) to challenge the final decision of the Commissioner of Social Security (the "Agency"), finding that: (i) Mollie Ragsdale was ineligible for Supplement Security Income ("SSI") benefits until October 1993; and (ii) John Ragsdale was overpaid SSI benefits in the amount of $1738.88 for the period February 1992 through September 1993. In both instances, the Agency's decision was predicated on the Agency's finding that the Ragsdales received unearned income in the form of a "rental subsidy" provided by their son, William Ragsdale.

The parties subsequently filed cross-motions for summary judgment and, on August 18, 1997, United States Magistrate Judge G. Warthen Downs issued a Proposed Memorandum Opinion, holding that the final decision of the Agency was not supported by substantial evidence. Summary judgment was thus granted in favor of the Ragsdales. The Agency filed objections to the Proposed Memorandum Opinion. For the reasons which follow, the objections are overruled and the Proposed Opinion is approved and shall be entered as the final decision of this Court with modifications consistent with this Memorandum Opinion.

## PROCEDURAL BACKGROUND AND STATEMENT OF FACTS

John T. and Mollie M. Ragsdale have been married for over fifty years and have lived at their current address for approximately twenty-three years. (R. at 112.) Before October 1993, the Ragsdales' son, William Ragsdale, owned the home in which his parents reside. (R. at 113.) In October 1993, William Ragsdale transferred to the Ragsdales a life-estate interest in the residence. (R. at 160–61.)

On February 18, 1992, Mrs. Ragsdale applied for SSI benefits, (see R. at 141), and, on July 21, 1993, an Administrative Law Judge ("ALJ") determined that Mrs. Ragsdale was disabled, thereby making her eligible for SSI benefits retroactive to her filing date in February. (R. at 64–69.) Mrs. Ragsdale was advised on September 20, 1993, however, that she was not entitled to SSI benefits for the period February 1992 through September 1993 because her total income for that period exceeded the federal benefit rate. (R. at 151–54.)

Previously, the Agency had determined that Mr. Ragsdale was disabled and, thereupon, he received SSI benefits from February 1992 through September 1993. (See R. at 216.) On September 23, 1993, however, Mr. Ragsdale was notified that he had been overpaid $1,738.88 in SSI benefits for the same period because his income for that period also had exceeded the federal benefit rate. (R. at 216.)

The Ragsdales disputed the Agency's conclusions, but the ALJ determined, in separate opinions, that Mr. and Mrs. Ragsdale, respectively, were the recipients of a "rental subsidy" from February 1992 through September 1993 because: (i) they had lived in a home owned by their son; and (ii) they had paid him a monthly rent less than the market rental value of the home. (See R. at 25–38.) This finding was based, in part, on William Ragsdale's statement that his parents had paid $279 per month in rent, but that he could have rented the house for $500 per month, its current rental value. (R. at 147.) That evidence is undisputed, but so too is the evidence that the Ragsdales alone were responsible for all repairs and maintenance, (see R. at 184–87), for the payment of utilities, (see R. at 114), and for insuring the residence against loss (see R. at 180–83).

The ALJ did not take the undisputed evidence into account and, instead, determined that the Ragsdales received excess income in the amount of $221 a month, that is, the difference between the monthly market rental value of the property ($500) and the $279 a month that the Ragsdales paid in rent to their son, William. (R. at 25–38.) This led the ALJ to conclude that: (i) Mrs. Ragsdale was ineligible for SSI benefits for the period

February 1992 through September 1993;[2] and (ii) Mr. Ragsdale had been overpaid SSI benefits in the amount of $1,738.88 during that period because the Ragsdales' monthly income in 1992 ($796)[3] and 1993 ($812)[4] exceeded the federal benefit rate of $633 and $652 per month for those years, respectively, for an SSI couple. (*See* R. at 29, 38, 173); 20 C.F.R. § 416.412 (1996) (listing the federal benefit rate for an eligible couple for the years 1992 and 1993). Thus, according to the ALJ, for the period February 1992 through September 1993, the Ragsdales were ineligible for SSI benefits, Mrs. Ragsdale was not entitled to SSI benefits until October 1993, (*see* R. at 29), and Mr. Ragsdale was not entitled to a waiver of overpayment for SSI benefits he had received during that period, (*see* R. 33–38). The ALJ's determinations were affirmed by the Appeals Council on December 30, 1996. (R. at 8–11.)

The Ragsdales, then, pursuant to 42 U.S.C. § 405(g), instituted this action, seeking judicial review of the Agency's final decision to deny Mrs. Ragsdales claim for SSI benefits until October 1993 and its decision to deny Mr. Ragsdale a waiver of overpayment. On August 18, 1997, United States Magistrate Judge G. Warthen Downs filed a Proposed Memorandum Opinion concluding that the Agency's final decision was not supported by substantial evidence and granting the Ragsdales' motion for summary judgment. The Agency thereafter filed objections to the Magistrate Judge's Proposed Memorandum Opinion. According to the Agency, the issue before the Court is straightforward: Whether the rental subsidy provided by the Ragsdales' son, William Ragsdale, was unearned income attributable to the Ragsdales under application of the applicable regulations, rendering Mrs. Ragsdale ineligible for SSI benefits from February 1992 through September 1993 and generating an overpayment of SSI benefits to Mr. Ragsdale for the same twenty-month period. To this issue, then, the Court now turns.

## DISCUSSION

### A. STANDARD OF REVIEW

When a social security claimant appeals a final decision of the Agency, the district court must determine whether, based on the administrative record, the Agency's decision was supported by substantial evidence and whether the proper legal standard was applied. *See* 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir.1990). Substantial evidence "consists of more than a mere scintilla of evidence but ... somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" *Hays*, 907 F.2d at 1456 (citing *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir.1966)); *see Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir.1984). The purpose of the court's review, however, is not to supplant the ALJ's finding with the court's own judgment if the administrative decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456; *Laws*, 368 F.2d at 642. The ALJ, not the reviewing court, is charged with the duty "to make findings of facts and to resolve conflicts in the evidence." *Hays*, 907 F.2d at 1456.

2. As previously noted, in October 1993, the Ragsdales received a life-estate interest in the property owned in fee simple by their son, William Ragsdale. Having acquired an ownership interest in the property, the Ragsdales were no longer recipients of a rental subsidy beginning in October 1993. Hence, the Ragsdales, since October 1993, have received SSI benefits. The only issue before the Court, then, is whether the Ragsdales' countable income for the period February 1992 through September 1993 renders them eligible for SSI benefits for the same period.

3. The Ragsdales' countable income, as a couple, in 1992, according to the Agency, totaled $796 and consisted of the following: $486 in social security insurance benefits, $89 in SSI benefits payable to Mr. Ragsdale and $221 unearned income represented by the alleged rental subsidy received by the Ragsdales from their son. (R. at 173.)

4. According to the Agency, the Ragsdales' countable income for purposes of determining SSI eligibility for 1993 totaled $812, a figure comprised of the following: $500 in social security benefits, Mr. Ragsdales $91 in SSI benefits, and $221 unearned income, again, the alleged rental subsidy received by the Ragsdales from their son. (R. at 173.)

## B. THE MERITS OF THE CASE

### 1. General Regulatory Framework of the Supplemental Security Income Program

Although admittedly cursory, the following synopsis of the complicated regulatory framework of the SSI program suffices to explain the context in which the issues presented by this action must be resolved.

The SSI program, authorized by Title XVI of the Social Security Act, provides benefits to the elderly, blind, or disabled who meet certain statutory income and resource limitations. *See* 42 U.S.C. §§ 1381–1382b (1992 & Supp.1997). An SSI recipient, under the federal program, is paid a monthly payment which is reduced by the recipient's "countable income." *See id.* § 1382a(b)(2)(A)–(B); 20 C.F.R. § 416.1101 (1997). Countable income encompasses earned and unearned income, the latter consisting of support and maintenance furnished both in cash and in kind. 20 C.F.R. §§ 416.1104, 416.1120 (1997). The provision of in-kind support and maintenance to SSI recipients is valued by the Agency through application of one of two regulatory calculations. *See id.* § 416.1130(c).

First, if an individual lives in another person's household and "[r]eceives both food and shelter from the person in whose household [she] is living," the so-called "one-third reduction rule" applies. *Id.* § 416.1131(a)(2). If the conditions precedent to application of that rule are satisfied, support and maintenance received in kind is valued at one-third of the federal benefit rate, notwithstanding its current market value, and is treated as additional income for purposes of determining SSI eligibility. *Id.* § 416.1131(a).[5]

Second, there is the "presumed value rule" which the Agency applies in all other circumstances. *Id.* § 416.1130(c). The presumed value is one-third of the federal benefit rate plus the "general income exclusion," which currently is $20 per month. 42 U.S.C. § 1382a(b)(2)(A) (Supp. IV 1986); 20 C.F.R. §§ 416.1140, 416.1124(c)(12) (1997). The presumed values for 1992 and 1993 were $231 and $237.33, respectively.[6] Under the presumed value rule, the recipient is assumed to have additional income equal to the presumed value (in other words, the in-kind income is not valued at its prevailing market worth). *Id.* § 416.1140(a)(1).[7]

When the presumed value rule is used, however, the recipient has the opportunity to prove that the actual value of the support is less than its presumed value. *Id.* § 416.1140(a)(2). "Actual value" is defined as the current market value or the amount paid by the provider for the item. *Id.*

Of course, it is important to keep in mind that, before application of these valuation rules—either the one-third reduction rule or presumed value rule—the SSI recipient must first have acquired "in-kind" support and maintenance. *See id.* § 416.1130.

> In-kind support and maintenance means any *food, clothing, or shelter* that is given to you or that you receive because someone else pays for it. Shelter includes room, rent, mortgage payments, real property taxes, heating fuel, gas, electricity, water, sewerage, and garbage collection services.

*Id.* § 416.1130(b). In-kind support and maintenance also applies when an SSI recipient receives a rent reduction or "rental subsi-

---

5. Similarly, the one-third reduction rule applies to a couple who lives in the household of another and receives both food and shelter from that person. In this circumstance, in-kind support and maintenance is valued at one-third of the couple's monthly benefit rate. *See* 20 C.F.R. § 416.1147(a) (1997).

6. These calculations are derived by taking one-third of the federal benefit rates of $633 for 1992 and $652 for 1993 and adding to these quotients the $20 general income exclusion. *See* 20 C.F.R. § 416.1140(a)(1) (1997); 20 C.F.R. § 416.412 (1996).

7. Similarly, in the case of a married couple, if the partners do not live in another's household and receive food and shelter from that individual, and neither resides in a medical institution, the SSA will value any food, clothing, or shelter that the couple "receive[s] at one-third of the Federal benefit rate plus the ... general income exclusion ([20 C.F.R.] § 416.1124(c)(12))," namely, $20. 20 C.F.R. §§ 416.1147(a, c) (1997).

dy," as termed by the Agency, from a relative-landlord.

For example, if an SSI recipient pays less than market value for food, clothing, or shelter and the presumed value rule applies, the Agency presumes that the in-kind support and maintenance attributable to the SSI recipient is equal to the presumed value, or "[t]he current market value of any food, clothing, or shelter" that the SSI recipient receives minus any payment that the recipient makes for these items, whichever is lower. *Id.* § 416.1140(a)(2)(i). The presumed value is the maximum value that can be imputed to the recipient as income for the purposes of determining SSI eligibility. *See id.*

An SSI recipient, however, is "not receiving in-kind support and maintenance in the form of room or rent if [she is] paying the amount charged under a business arrangement." *Id.* § 416.1130(b). "A business arrangement exists when the amount of monthly rent required to be paid equals the current market rental value." *Id.* (citation omitted). Under this regulation, in situations where a parent-child relationship exists between the tenant and the landlord, the difference between the current market value and the rent actually paid for shelter is treated as in-kind income attributable to the SSI recipient, up to, of course, the presumed value.

## 2. The Different Rules Applicable to Residents of States Which Comprise the Seventh and Second Circuits

Different regulating rules, however, are applied in the states comprising the Seventh and the Second Circuits. The first change in the Agency's rules occurred in response to *Jackson v. Schweiker,* 683 F.2d 1076, 1086–87 (7th Cir.1982), in which the United States Court of Appeals for the Seventh Circuit held that unearned income in the form of a rental subsidy may be attributable to an SSI recipient only if that unearned income is "actually available" to meet the basic needs of the recipient. After the *Jackson* decision, the Agency promulgated a regulation codifying a unique definition of a business arrangement, which applies only to those three states that comprise the Seventh Circuit, that is, Illinois,

Indiana, and Wisconsin. That regulation provides, in pertinent part, as follows:

> *In the States in the Seventh Circuit … a business arrangement exists when the amount of monthly rent required to be paid equals or exceeds the presumed maximum value ….* In those States, if the required amount of rent is less than the presumed maximum value, [the Agency] will impute as in-kind support and maintenance, the difference between the required amount of rent and either the presumed maximum value or the current market value, whichever is less.

20 C.F.R. § 416.1130(b) (emphasis added) (citation omitted). In other words, under this rule, if an SSI recipient's monthly rental payment exceeds the presumed value, the Commissioner will not impute as unearned income support and maintenance furnished in kind for purposes of determining SSI eligibility.

Similarly, in *Ruppert v. Bowen,* 871 F.2d 1172 (2d Cir.1989), the United States Court of Appeals for the Second Circuit, almost seven years later, adopted the economic rationale of *Jackson* with certain modifications. Thereafter, the Agency issued an Acquiescence Ruling reflecting the intent of the Agency to evaluate rental subsidies, for those individuals residing within the Second Circuit, as in-kind income in accordance with the holding of *Ruppert.* The Acquiescence Ruling explains:

> *This Ruling applies only in cases in which the applicant or recipient resides in Connecticut, New York, or Vermont* at the time of the determination or decision at any administrative level ….

> In cases where [the Agency] determines that an applicant or recipient has received a rental subsidy, [the Agency] will determine whether the applicant or recipient received an "actual economic benefit" from the rental subsidy. If [the Agency] determines that the applicant or recipient received an "actual economic benefit", he or she will be imputed to have received in-kind support and maintenance. If [the Agency] determines that the applicant or recipient did not receive an "actual economic benefit", the rental subsidy will be

disregarded for purposes of determining eligibility for and the amount of [SSI] benefits.

*... [the Agency] ... will determine that an applicant or recipient did not receive an "actual economic benefit" from a rental subsidy when the monthly amount of rent required to be paid equals or exceeds the presumed maximum value ....* If the required amount of rent is less than the presumed maximum value, we will impute as in-kind support and maintenance the difference between the required amount of rent and either the presumed maximum value or the current market rental value, whichever is less.

Social Security Acquiescence Ruling 90–2(2), 55 Fed.Reg. 28,947, 28,949 (1990) (emphasis added). As in the Seventh Circuit, no unearned income in the form of a rental subsidy will be imputed to an SSI recipient residing in the Second Circuit if the monthly rent paid by the SSI recipient equals or exceeds the presumed value.

### 3. The Agency's Position in this Case

Here, the Agency woodenly refused to apply the rationale of *Ruppert* and *Jackson,* concluding instead that the Ragsdales' countable income exceeded the federal benefit rates in 1992 and 1993, rendering them ineligible for SSI benefits for the twenty-month period at issue here.

The Ragsdales argue that the decision of the Agency to treat the difference between the fair rental value of their housing and the rent actually expended as imputed earned income was erroneous. More specifically, the Ragsdales contend that, because the so-called "rental subsidy" has not translated into an actual economic benefit or additional purchasing power, the unearned income in the form of a rental subsidy should be disregarded. The issue, then, is whether the value of in-kind support and maintenance derived from the provision of shelter at a monthly rate below its market value, under the circumstances presented here, should be imputed to the Ragsdales as income for the purposes of determining their eligibility for federal SSI benefits. Because the Ragsdales would have this Court follow the rationale of both *Jackson v. Schweiker* and *Ruppert v. Bowen,* an examination of those decisions is necessary.[8]

### 4. The "Rental Subsidy and In-kind Support and Maintenance Questions" as Decided in the *Jackson* and *Ruppert* Decisions

In *Jackson v. Schweiker,* 683 F.2d 1076, 1077 (7th Cir.1982), the plaintiff filed a class action to challenge the Agency's regulations controlling SSI eligibility which attribute, as unearned income, the difference between the fair rental value and the rent actually paid by an SSI recipient. The named plaintiff, Madgey Jackson, received $56.40 per month in SSI benefits and a monthly Veteran's Administration ("VA") pension of $133.00, producing a monthly countable income of $189.40 *Id.* Ms. Jackson lived alone in a house owned by her sister and paid a monthly rent of $145.00. *Id.* Thus, out of Ms. Jackson's total monthly income of $189.40, before termination of her SSI benefits, approximately 77% of this amount was committed to the costs of shelter. *Id.* 683 F.2d at 1080. Similarly, Ms. Jackson was able to devote only $44.40, or approximately 23%, to cover expenses other than those associated with shelter. *Id.*

Subsequently, Ms. Jackson's sister informed the Agency that a non-relative tenant would be charged $250.00 per month to reside in the home which she had provided to Ms. Jackson. *Id.* at 1077. Thereupon, the Agency concluded that the difference be-

---

**8.** The Ragsdales do not assert that the Agency's actions in adopting different rules for residents in the Second and Seventh Circuits than for other similarly situated citizens is a denial of the equal protection of the law. Nor do the Ragsdales challenge the rather absurd position of the Agency as an arbitrary and capricious exercise of the Agency's powers. Hence, those questions are not addressed here. However, the Court notes that the Second and Seventh Circuits include a most significant part of this country's population and observes that the Agency has offered no explanation (save perhaps unthinking and wooden adherence to its own rules) why citizens, in New York, Connecticut, Vermont, Illinois, Indiana, and Wisconsin ought to (or rightfully can be) treated differently than citizens of Virginia or, for that matter, the citizens of the states not in the Second and Seventh Circuits.

tween the market value of her sister's home ($250.00) and the rent actually paid by Ms. Jackson ($145.00) was attributable to Ms. Jackson as unearned income in the form of in-kind support and maintenance. *Id.* at 1080. Rather than imputing the $105.00 to Ms. Jackson as unearned income, under the presumed maximum value rule, the lesser value of $83.13 (the presumed value for an individual at the time) was utilized instead. *Id.* Because Ms. Jackson's countable income, which included the $83.13 in unearned income, exceeded the prescribed eligibility level, Ms. Jackson's SSI benefits totaling $56.40 were terminated. *See id.* at 1077, 1080–81.

In passing on Ms. Jackson's challenge to the Agency's termination of SSI benefits, the Seventh Circuit examined the theoretical economic effect on Ms. Jackson assuming first that her SSI benefits were terminated. Out of a total "income" of $216.13 per month, which consisted of a $133.00 VA pension and $83.13 imputed unearned income, 106% of the monthly figure would be drained by shelter costs totaling $228.13. *Id.* at 1081. The latter figure is comprised of a $145.00 monthly rental and $83.13 imputed unearned income, namely, the assigned value to Ms. Jackson of the difference between the market value of the rented house provided by her sister and the amount she actually paid. *See id.*

Viewing Ms. Jackson's economic situation in that light, the Seventh Circuit concluded that any unearned income which may be imputed to an SSI recipient must "represent[] real growth in purchasing power to meet basic needs." *Id.* at 1084. "[P]urchasing power grows," according to the *Jackson* court, "if in-kind contributions of shelter either make cash available to purchase necessities of life other than shelter or if, and to the extent, the quality of shelter itself is enhanced to beet basic needs." *Id.*

In Ms. Jackson's case, however, "[w]here a very large percentage of income, such as 77%[,] ... is committed to shelter costs before termination of SSI," the Seventh Circuit concluded that "it flies in the face of reality to conclude that 'unearned income' in the form of subsidized shelter as measured by the difference between actual rent and mar-

ket rent" denotes an increased ability to purchase other goods either needed or wanted. *Id.* at 1085. The Seventh Circuit explained:

> The increased value to Jackson, or a similarly situated recipient, of the additional shelter is, as shelter, minimal; moreover, no additional funds have been made available to Jackson to meet non-shelter needs. The additional shelter is, in effect, "phantom income." In the argot of economics, the marginal utility (or incremental value) of the additional housing, to a recipient already devoting 77% of her income to shelter, although greater than zero, is far less than the excess of market value over actual rent.

*Id.* at 1082 (*citing* P. Samuelson, Economics 425–26, 433–38 (10th ed.1976)).

An apt illustration of the marginal utility of each additional dollar of housing attributable to Ms. Jackson as income was used by the Seventh Circuit to illustrate this point: "How much is a glass of water worth to a drowning man? or $105.00 of housing to a person 'drowning' in housing." *Id.* at 1085. Concluding that "[t]he Secretary's regulation contain[ed] no mechanism to reflect amounts or proportions of income committed to shelter," the Seventh Circuit remanded the case to the district court and "order[ed] the Secretary either to amend the challenged regulation or to change his application of, and procedure under, the regulation to provide relief to affected class members consistent with [the *Jackson*] opinion." *Id.* at 1086.

As explained previously, in response to the *Jackson* decision, the Agency incorporated the *Jackson* holding into a regulation, applicable only to residents of the states that fall within the jurisdiction of the Seventh Circuit. The regulation provides as follows:

> You are not receiving in-kind support and maintenance in the form of room or rent if you are paying the amount charged under a business arrangement. A business arrangement exists when the amount of monthly rent required to be paid equals the current market rental value. *Exception: In the States in the Seventh Circuit (Illinois, Indiana, and Wisconsin), a business arrangement exists when the amount of monthly rent required to be paid equals*

*or exceeds the presumed maximum value* .... In those States, if the required amount of rent is less than the presumed maximum value, we [the Agency] will impute as in-kind support and maintenance, the difference between the required amount of rent and either the presumed maximum value or the current market value, whichever is less.

20 C.F.R. § 416.1130(b) (1997) (first emphasis in original) (citation omitted).

Several years later, the United States Court of Appeals for the Second Circuit, in *Ruppert v. Bowen*, 871 F.2d 1172, 1174 (2d Cir.1989), confronted a challenge to the method used by the Agency in determining the value of in-kind, unearned income provided by the families of eleven SSI recipients. Urging the Second Circuit to follow the reasoning of *Jackson*, the plaintiffs' "most cogent argument," according to the *Ruppert* court, was "that if they spend a very large percentage of their cash benefits on rent, then, as per the 'purchasing power' test in *Jackson*, they do not have the purchasing power to secure other basic needs and thus do not receive [an] 'actual economic benefit' from below-market rents." *Id.* 871 F.2d at 1179.

■ Although the Second Circuit did not embrace *Jackson* directly, the *Ruppert* court did hold that "if the proportion of income that [the SSI recipients] expend on shelter is so great that 'it flies in the face of reality to conclude that 'unearned income' in the form of subsidized shelter ... is 'actually available' to the recipient,' ... the unearned income should be disregarded" unless the rental subsidy reflects an "actual economic benefit." *Id.* at 1180 (*citing Jackson*, 683 F.2d at 1085). Remanding several appellants' claims to the district court to make this determination, the Second Circuit did not define "actual economic benefit," but noted that "[t]he regulations used in the Seventh Circuit might provide a good indication" of what constitutes an actual economic benefit without "necessarily requir[ing] their adoption as a matter of law." *Id.* 871 F.2d at 1180–81.[9]

As a result of the *Ruppert* decision, the Agency, on July 16, 1990, issued an Acquiescence Ruling, which provides that an SSI applicant or recipient will not be treated as receiving an "actual economic benefit" from a rental subsidy—that is, a reduction in rent below the market value by a relative-landlord—if the monthly rental payment equals or exceeds the presumed value. Social Security Acquiescence Ruling 90–2(2), 55 Fed. Reg. 28,947, 28,949 (1990). Conversely, *only if* the monthly rental payment is less than the presumed value will in-kind support and maintenance be imputed to the applicant or recipient as additional income.[10] This Acquiescence Ruling is essentially the same as the regulation used in the Seventh Circuit which defines a business relationship.[11] Although

---

**9.** As the Second Circuit recognized in *Ruppert*, one of the regulations relied on by the Seventh Circuit in *Jackson* no longer appears in the Code of Federal Regulations. The previous regulation provided that "[i]n determining the amount of unearned income the amount actually available to the individual is considered." 20 C.F.R. § 416.1120 (1980). The Second Circuit, however, noted that "[t]his change in the regulations is not controlling, both because the Secretary does not rely on this change and because we remand for determination whether [the] actual economic benefit test," first enunciated by the Second Circuit in *Rothman v. Schweiker*, 706 F.2d 407 (2d Cir.1983), "was met rather than deciding to adopt *Jackson* directly." *Ruppert*, 871 F.2d at 1180 n. 4.

**10.** Under these circumstances, Social Security Acquiescence Ruling 90–2(2) indicates that "the difference between the required amount of rent and either the presumed maximum value or the current market rental value, whichever is less" will be imputed to the applicant or recipient as countable income in the form in-kind support and maintenance. 55 Fed.Reg. 28,947, 28,949 (1990).

**11.** The principal difference between the Social Security Acquiescence Ruling 90–2(2) and 20 C.F.R. § 416.1130(b), the regulation which defines a business relationship in the Seventh Circuit, is, in essence, one of semantics. In the Seventh Circuit, for example, if an SSI recipient's rental payment exceeds the presumed value a business relationship is presumed to exist between the relative-tenant and relative-landlord. *See* 20 C.F.R. § 416.1130(b). Conversely, if the rental payment of an SSI recipient residing in the Second Circuit exceeds the presumed value, the SSI recipient has not received an "actual economic benefit" from a rental subsidy provided by a relative-landlord. *See* 55 Fed.Reg. at 28,949.

the Second Circuit, in *Ruppert*, did not require adoption of the Seventh Circuit regulations as a matter of law, subsequently, in *Gordon v. Shalala*, 55 F.3d 101, 104 (2d Cir.1995), *cert. denied*, 517 U.S. 1103, 116 S.Ct. 1317, 134 L.Ed.2d 470 (1996), the Second Circuit held that adoption of the regulations applicable in the Seventh Circuit was both reasonable and acceptable. *See* Social Security Acquiescence Ruling 90-2(2), 55 Fed.Reg. 28,947, 28,949 (1990).

The United States Court of Appeals for the Fourth Circuit has not yet addressed the issue presented here. Finding that *Ruppert* is persuasive, the Court here adopts, as its own, the reasoning of the *Ruppert* decision, as well as the "economic reality" analysis utilized by the Seventh Circuit in *Jackson*.[12]

### 5. The *Jackson/Ruppert* Analysis Applied to the Ragsdales' Case

■ Under *Jackson* and *Ruppert*, it is necessary to review the record to ascertain the economic reality facing the Ragsdales. On that point, the Agency determined that the Ragsdales were ineligible for SSI benefits for the period February 1992 through September 1993 because their total income, including imputed unearned income resulting from an alleged rental subsidy, exceeded the

federal benefit rates in 1992 and 1993. In 1992, *before termination of their benefits*,[13] the Ragsdales, as a couple, received $575 monthly, consisting of $486 in social security in addition to Mr. Ragsdale's $89 in SSI benefits. (R. at 173.) Also, in 1993, the Ragsdales were receiving $500 in social security payments in addition to $91 in SSI payable to Mr. Ragsdale, for a total of $591. (R. at 173.)

During the twenty-month period at issue, the Ragsdales lived in a home owned by their son, William Ragsdale. The ALJ determined that the rental value of the house (during the relevant time period) was $500, and although on the high end of the scale, that figure was supported by substantial evidence.[14] In addition to their monthly rental payment of $279, the Ragsdales also were required to pay their own utilities and homeowners insurance and were obligated to pay for all repairs and maintenance of the house, totaling approximately $2,025 from February 1992 through September 1993, or roughly $101 per month.[15] Also, according to the uncontroverted testimony in the record, the Ragsdales paid roughly $123 per month for utilities. (*See* R. at 27, 35, 114.) Of the Ragsdales monthly income of $575 in 1992,

---

**12.** The decision in *Jackson* is not completely apposite here because the underlying Agency regulation was somewhat different in *Jackson* than in *Ruppert*. Nonetheless, the economic rationale of *Jackson* is still viable.

**13.** *See, e.g.*, *Gordon v. Shalala*, 55 F.3d 101, 104 (2d Cir.1995) ("[E]xamination of *Jackson*, upon which *Ruppert* is based, shows that the relevant percentage of income is determined using figures *before* termination [or here, reduction] of SSI benefits") (*citing Jackson*, 683 F.2d at 1085) (emphasis and alteration in original).

**14.** William Ragsdale, in a signed statement provided to the Agency, stated that the current rental value of the home he rented to his parents was $500 per month. An Agency claims representative, then, contacted two realtors who represented that most homes in the area would rent from $300 to $500 depending on the size and condition. (R. at 156–59.) The ALJ admitted that a $500 figure would be on the high side of that range, but concluded that, because William Ragsdale, the owner of the property, provided that amount, the Agency was entitled to use it. (R. at 28, 36.) Substantial evidence, therefore, supports the ALJ's conclusion that the market rental value of the Ragsdales home from Febru-

ary 1992 until September 1993 was $500 per month.

**15.** The ALJ rejected the Ragsdales' argument that they were responsible for repairs, maintenance, and insurance because, according to the ALJ, "there was no legal obligation on their part to make such payments" because the Ragsdales "never signed a lease, and they never had a written agreement with regard to repairs and maintenance." (R. at 28, 36.) Magistrate Judge Downs, however, concluded that the ALJ's determination was not supported by substantial evidence, a conclusion which this Court affirms. The uncontradicted record reveals that no one, other than the Ragsdales, incurred those expenses. (*See* Proposed Mem. Op. at 4–5.)

Although Judge Downs concluded that the total expended on these three categories of shelter costs approached $2700 over the relevant twenty-month period, (*see id.* at 5), the Court will use the more conservative figure, which is grounded in receipts and other documentary evidence, of about $2,025. (*See* R. at 180–87.) This does not, in any way, undermine the credibility of the Ragsdales, whose testimony was uncontradicted in the record. (*See* Proposed Mem. at 4–5.)

therefore, approximately $503 or 87% of the Ragsdales' monthly income was earmarked to shelter costs. In 1993, the figure drops slightly to 85%. Because the Ragsdales, from February 1992 through September 1993, devoted such a large proportion of their income to meet shelter costs before termination of SSI, "it flies in the face of reality to conclude that 'unearned income' in the form of" a rental subsidy "is 'actually available' to the recipient" *Jackson,* 683 F.2d at 1085.

Because the Court adopts the "actual economic benefit" test announced in *Ruppert,* the only remaining issue, then, is whether the Ragsdales received an actual economic benefit from the unearned income measured by the difference between the market rental value of the shelter provided by their son and the rent actually paid. An answer in the negative, requires that any unearned income must be disregarded when computing the SSI eligibility of the Ragsdales for the twenty-month period at issue here.

In this regard, the Second Circuit recognized in *Gordon* that the rule announced in Acquiescence Ruling 90–2(2), which is modeled after the regulations used in the Seventh Circuit, is a reasonable and acceptable standard in determining whether an individual has realized an "actual economic benefit." *See Gordon,* 55 F.3d at 104. This Court agrees and holds that, because the rent required to be paid by the Ragsdales to their son exceeded the presumed maximum values for the period at issue, the Ragsdales did not receive an "actual economic benefit" from the purported rental subsidy. Accordingly, the $1738.88 overpayment assessed to Mr. Ragsdale is reversed and any money withheld from Mr. Ragsdale shall be repaid. Additionally, Mrs. Ragsdale is entitled to retroactive SSI benefits for the twenty-month period February 1992 through September 1993.

### CONCLUSION

This litigation need never have occurred. And, that it did, reflects poorly on the Agency which elected not to seek review of the decisions issued by the Second or Seventh Circuits and then put the Ragsdales to the needless task of establishing the obvious: that the decisions of the Second and Seventh Circuits were correct. Citizens residing in the Fourth Circuit should not be required needlessly to incur costs and fees in order to achieve the rights already enjoyed by those individuals residing in the Second and Seventh Circuits. It may be that the Agency's conduct is not sanctionable in this case, but it must be hoped that the Agency will not, in the future, pursue the course which it has followed here.

For the reasons set forth above, the objections to the Proposed Memorandum Opinion raised by the Agency are overruled. The Proposed Memorandum Opinion is affirmed and shall constitute the final decision of this Court as modified herein.

It is so ORDERED.